GRAZIELLA A. BAKHIT, APPELLEE, v. HARLEY EINER THOMSEN, APPELLANT.

225 N. W. 2d 860

Filed February 13, 1975. No. 39551.

Harold W. Kauffman and Eugene P. Welch of Gross, Welch, Vinardi, Kauffman & Day, for appellant.

Frank Matthews of Matthews, Kelley, Cannon & Carpenter and Simon A. Simon, Sr., for appellee.

Heard before SPENCER, BOSLAUGH, McCOWN, NEWTON, CLINTON, and BRODKEY, JJ., and COLWELL, District Judge.

BRODKEY, J.

This appeal involves an action brought by the plaintiff, Graziella (Grace) Bakhit, for injuries sustained in an intersectional automobile collision between the vehicle in which plaintiff was riding as a guest passenger and a vehicle driven by the defendant. The answer was a general denial. The trial court directed a verdict for the plaintiff on the question of liability and submitted to the jury only the issue of the amount of damages and the question of the proximate cause thereof. After more than 6 hours deliberation, the jury returned a 10-to-2 verdict for the plaintiff in the amount of $72,000. Defendant's motion for new trial was overruled, but the court subsequently entered a nunc pro tunc order requiring a remittitur in the sum of $8,958.99 which represented advance payments previously made by the defendant and other sums not related to the accident in question. The defendant thereafter perfected his appeal to this court, assigning numerous errors which he claims prevented the defendant from having a fair trial, and which constituted prejudicial error requiring reversal of the judgment of the trial court. We affirm.

The defendant does not assign as error the action of the trial court in directing the verdict on the liability of the defendant, and we therefore consider only the defendant's assignments of error as they pertain to the trial of the issue of plaintiff's damages. These assignments of error, as set out in defendant's brief, may be summarized as follows: (1) Excessiveness of the verdict; (2) error in the submission of the issue of permanent injuries; (3) error in admitting in evidence answers of Dr. Mark B. Coventry to a hypothetical question propounded by the plaintiff; (4) error in having the court reporter read the deposition of Dr. Mark B. Coventry in its entirety to the jury after it

retired for deliberation in the absence of the parties and their counsel, and without notification to them; (5) error in the reading of said deposition in the absence of the judge from the courtroom; and (6) error of the trial court in holding it was not prejudicial error for jurors to bring into the courtroom from the jury room notes that the jurors had been making during their deliberations and to take notes during the reading of the aforesaid deposition of Dr. Mark B. Coventry. We shall discuss these assignments of error in the order in which they are set forth in defendant's brief.

By way of introduction, we should state the evidence in the record discloses that the plaintiff received various kinds and types of injuries in the accident referred to, including injuries to her back both in the cervical area and in the low back area, and also to her shoulder. At the time of the trial she had substantially recovered from these injuries. However, she also claimed that she suffered an injury to her right knee as a result of the accident, with constant and severe pain and swelling in her knee thereafter, which prevented her from engaging in work and other activities, and as a result of which she was forced to undergo an osteotomy on her right knee by Dr. Mark B. Coventry of the Mayo Clinic, Rochester, Minnesota. That operation was only partially successful, and, as will be hereinafter discussed, Dr. Coventry testified that that operation, performed to correct a valgus, or knock-kneed condition of the plaintiff to relieve her pain, did not completely do so and, according to his opinion, the plaintiff would suffer pain in the future, and that the condition was permanent. He also testified that the pain in her knee was caused by the accident in question. Defendant, however, disputes that there was any injury to the knee, and pain resulting therefrom, caused by the accident in question, or caused by an aggravation of a preexisting condition, and further disputes that there is any evidence sustaining plain-

tiff's claim of the permanency of such injuries to her knee, if any.

There is no dispute, however, that the collision out of which this action arose did occur on January 19, 1971, at the intersection of 38th and Burt Streets, in Omaha; and that at the time plaintiff was riding as a passenger in the right front seat of the vehicle, which was owned and operated by her son. Plaintiff's daughter, Elizabeth Bakhit, was also riding in the middle of the front seat of the automobile, between her brother and her mother. There is also no question as to the fact that the point of impact between the two automobiles occurred on the right front door of the vehicle in which plaintiff was riding, leaving an indentation in the door in close proximity to where Mrs. Bakhit was seated. Mrs. Bakhit was rendered unconscious as a result of the accident and was thereafter taken to the hospital by the police. Additional facts will be commented upon at appropriate places in the following discussion.

With the above as a background, let us now consider, although perhaps not in logical order, defendant's first contention that the verdict returned by the jury in this case was excessive in amount. Defendant argues that the evidence fails to sustain an award of $72,000, and that such award was excessive and unconscionable and was the result of passion and prejudice. The record reveals that Mrs. Bakhit had been steadily employed for a period of over 18 years before the accident and had contributed to the support of her husband and their five children. She was in good health during that period and lost no time from work for any injuries, although there is some evidence in the record that she had at one time had some trouble with her left knee, and also on one occasion to her right knee in her employment from pushing boxes with her knee. However, this did not necessitate an interruption of her work and apparently she either recovered or the condition had become dormant thereafter. In any event both orthopedic surgeons

who treated her, Dr. Michael O'Neil in Omaha, and Dr. Mark B. Coventry, Chairman of the Department of Orthopedics at the Mayo Clinic, testified that she was still disabled as a result of the accident and that she would not improve. The testimony of Dr. Coventry will be subsequently discussed in more detail. Mrs. Bakhit testified that she had no skills and could not type, take shorthand, or operate a switchboard, and that the only work she was equipped to handle was that which she had previously performed all her days in this country, factory labor. Since her accident, she can no longer remain seated for long periods and cannot stand for long periods or walk long distances.

Let us now consider the testimony with reference to her damages as reflected by the record. At the time of the accident Mrs. Bakhit was 44 years old and had a life expectancy of 28.67 years. The evidence reveals that at the time of the accident she was earning $3.04 per hour. Therefore computing her loss of earnings from the date of the accident to the date of the trial, a period of 3 years, on the basis of $3.04 per hour on the basis of a 40-hour week and a period of 52 weeks per year, that loss amounts to $6,323.20 per year, or $18,969.60 for a 3-year period. With respect to her loss of future earnings, in her argument in her brief she asked the jury only for loss of future earnings to age 62, which is a common retirement age, or a period of 18 years, instead of the 28.67 years under the life expectancy tables. On the basis of a yearly wage of $6,323.20 and reduced by a present value (5 percent table) this would amount to an additional sum of $73,915.59. The medical expense incurred is not disputed and amounted to $8,376.91, making a grand total of $82,292.50, which represents special damages only. This figure does not take into account any award for pain and suffering, nor anticipated wage increases, nor provison for work after the age of 62. The rule is well established that a verdict for damages will not be set aside unless it is so

clearly exorbitant as to indicate prejudice or disregard of evidence or controlling rules of law. Pierson v. Cleven, 182 Neb. 816, 152 N. W. 2d 408 (1968); Zawada v. Anderson, 181 Neb. 467, 149 N. W. 2d 329 (1967). In this case, even without an allowance for pain and suffering, and the other elements referred to, it is obvious that the jury verdict of $72,000 was not excessive. The question of damages was submitted to the jurors for their determination as finders of fact, under proper instructions, and we are not inclined to disturb their decision upon this point.

Although defendant contends to the contrary, we conclude there is sufficient evidence in the record to justify the court submitting the issue of permanent injuries to the jury. Dr. O'Neil testified that plaintiff's back injury is "more or less permanent," depending upon the type of activity she engages in, and there is evidence from both Dr. O'Neil and Dr. Coventry that the injury to her knee and pain resulting therefrom is permanent. The jury could and obviously did consider the fact that both doctors agreed her knee disability was caused by the accident and that she would never have a pain-free knee again.

We turn now to a consideration of defendant's claim that the trial court erred in admitting in evidence the answers of Dr. Coventry to the hypothetical question propounded to him. Defendant claims that the hypothetical question contained several material assumptions of fact not supported by, and actually contrary to, the evidence of the case; and that based on the assumptions contained in the hypothetical question, Dr. Coventry found a causal connection between the injury and the plaintiff's knee when he saw it. At the outset, we point out that the record reveals that Dr. Coventry was asked not one, but two, hypothetical questions concerning causation when his deposition was taken at the Mayo Clinic 6 weeks prior to the trial. In his brief, defendant does not specifically complain about the first hypotheti-

cal question, but we feel that it should be commented upon. Dr. Coventry expressed the opinion, based on his examination of Mrs. Bakhit and the reports he received from her referring physician, that the accident caused her disability. The reports referred to were received in evidence during the trial and appear as exhibits 4 and 6, and were before the jury during its deliberations. On direct examination by counsel as to the first hypothetical question Dr. Coventry stated: "Well, we must go by a patient's history, and we have the history of the patient from her, we have the history from the doctor who wrote us before her admission subsequently about her accident, so I must assume that she had an auto accident. She stated to us, both Dr. Reckles, my associate, and to me, that she had many injuries at the time of the accident, that she was shaken up and confused, *but that she doesn't remember specifically her knee until a couple of days afterward,* but that at least since then she has had continued pain and swelling and disability in her knee. So I must take what I hear at face value as a physician in evaluating a patient's situation, and therefore I am assuming that she did have an accident, that she did hurt her right knee, and that because of this injury had a continuing disability in the knee for which I saw and operated on her." (Emphasis supplied.)

However, it is the second hypothetical question propounded to Dr. Coventry to which defendant principally objects. The second hypothetical question was very lengthy and we shall not repeat it here in detail. Suffice it to say that it incorporated as assumptions to be made on the part of the answering doctor almost every conceivable fact in connection with the happening of the accident itself and the resulting injuries to the plaintiff. Defendant claims that the hypothetical question answered by the doctor included many false and incorrect assumptions, particularly that the question asked the doctor to assume that in the accident the plaintiff

was propelled forward against the front passenger compartment of the car "and as indicated by the report of the investigating police officer," her knees were bruised. The question also asked the doctor to assume that when the plaintiff left the hospital and went home and directly to bed, she experienced pain in her right knee which began to swell and the plaintiff could not walk because of it. Further the hypothetical question also assumed that the day following the accident the plaintiff's right knee became black and blue. Defendant insists that none of the foregoing assumptions are supported by evidence in the record, and therefore is in violation of the rule in this state that the material facts on which a hypothetical question is predicated must be supported by and must not be at variance with the evidence. Jacobson v. Skinner Packing Co., 118 Neb. 711, 226 N. W. 321 (1929). See, also, Nebraska Bar Association Evidence Manual (1966), p. 21-5, and cases therein cited.

In answer to the hypothetical question propounded, Dr. Coventry expressed his opinion with reasonable medical certainty that there was a causal relationship between the state of her knee when he saw it and the injury and gave his reasons for such opinion as follows: "Well, first of all the history that she gave me that she had no real disability in her knee prior to her accident, and secondly that the x-rays which I took would fit in with changes that would take place in the knee from the time of the alleged injury until I saw her." He also expressed the opinion that the pain would be permanent, notwithstanding the corrective osteotomy he performed, stating that if Mrs. Bakhit was going to get relief from her pain she would have had it by then. On cross-examination, he further expressed the opinion that the accident caused an increase in the valgus condition on the right.

It is true the record in this case contains no direct evidence that the plaintiff bumped her right knee on the dashboard of the car in which she was riding at the time

of the accident, nor that the right knee became black and blue and that she experienced pain and swelling therein immediately after the accident, but there is more than ample circumstantial evidence from which the jury could have found these facts to have been established. The report of the police officer who came to the scene of the accident immediately thereafter, does not contain any reference to any injury to Mrs. Bakhit's knee, but he admitted that it could have very well been an oversight on his part. There were also other matters which occurred at that time which were not included in his report. Mrs. Bakhit was rendered unconscious in the accident and apparently did not notice any pain in the knee until several days later and did not inform any of the doctors of her complaint about the knee until approximately 1 week following the date of the accident. However, the police officer's report did reveal that Elizabeth Bakhit, daughter of the plaintiff, who was riding next to her in the front seat, did bruise her knees in the accident. Defendant argues, however, that Elizabeth Bakhit was not wearing a seat belt at the time, whereas her mother, Mrs. Bakhit was wearing her seat belt and that therefore it would have been impossible for her knee to have struck the dashboard. While we concede that a properly fastened seat belt might make it difficult or impossible for the upper body of a passenger to strike the dashboard, we do not believe we can take judicial notice of the fact that a seat belt would necessarily prevent a passenger's knees from striking the dashboard in such an accident. In addition it might well have been that plaintiff's knee had come in contact with the indentation in the right door of the automobile, which, as previously stated, had received such damage as the result of the impact with the other automobile. While it is true that the plaintiff did not complain of injury to or pain in her knee immediately after the accident in the emergency room of the hospital to which she had been taken, this does not necessarily mean that

she did not receive such injury. In fact, one of her doctors in his testimony at the trial explained it was possible that the cause of the pain in her back and shoulder at that time was foremost in her mind in describing her injuries at the hospital, and that realization of the injury to her right knee might have come upon her at a subsequent time.

There was ample circumstantial evidence presented from which the jury could well have found that plaintiff did injure her knee in the accident with the results previously described. The problem of how close the facts recited in a hypothetical question as basis of assumptions on the part of an expert witness for the expression of an opinion is a most troublesome and vexatious one. Authorities are divided upon this issue. The modern trend is to disregard minor inaccuracies and variances. We point out that under Rule 705 of the recently adopted Federal Rules of Evidence, and also under the same section of the Proposed Nebraska Rules of Evidence (1973), it is provided that: "The expert may testify in terms of opinion or inference and give his reasons therefore without prior disclosure of the underlying facts or data, unless the judge requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination." Also in Maddocks v. Bennett, 456 P. 2d 453 (Alas., 1969), the court stated: "Although the rule is often stated that a hypothetical question must not contain unsupported facts, probably a majority of courts recognize that strict adherence to the rule would be impractical and pointless. An important case of this viewpoint is Treadwell v. Nickel, 194 Cal. 243, 228 P. 25, 34 (1924).

"The opinion can have little, if any, value unless the material facts assumed in such question are substantially true, and the court may properly so instruct the jury whenever there is conflicting evidence as to the truth of the assumed facts. Such opinion evidence does not, however, necessarily become wholly valueless be-

cause there is some variance between the facts assumed in the question and the factual facts proven. What weight should be given in such cases to the opinion of the expert witnesses is a question for the jury under proper instructions from the court." Our conclusion is that in the instant case the court properly admitted the answers of Dr. Coventry to the hypothetical questions propounded to him, and that the jury properly considered such evidence.

We now briefly consider defendant's assignment of errors allegedly occurring after the case was submitted to the jury, which was shortly after noon, on February 25, 1974. Before separating for the night, at about 4:30 p.m., the jury requested that the testimony of all the doctors be read back to them. At 9 o'clock the following morning that request was denied by the trial judge, who suggested that a request for any specific testimony from any doctor would be granted. Shortly thereafter, the jury requested that the deposition of Dr. Coventry be read to them and that request was granted. The court reporter, at the direction of the judge, read back to the jury all Dr. Coventry's deposition. This was done in the courtroom with only the jury, the court reporter, and the bailiff being present. The judge was absent from the courtroom. During the reading of the deposition by the court reporter, some of the jurors brought with them the notes they had been making during their deliberations, and also took additional notes during the reading of the deposition. At approximately 12:50 p.m., the jurors requested that Dr. O'Neil's testimony be read to them. This request was denied by the trial judge. He told the jurors to request any specific testimony of Dr. O'Neil that they wished to have read back. At 1:35 p.m., they requested that all Dr. O'Neil's testimony except his qualifications be read to them; but before the arrangements could be made to do so, the jurors' request was withdrawn and the jury foreman advised that

the jurors did not want Dr. O'Neil's testimony read back and indicated they had arrived at a verdict.

The reading by an official court reporter of testimony of a witness examined on trial after the jury has retired for deliberation, when a disagreement arises within the jury as to certain testimony, is proper and has been approved by this court. State v. McCown, 189 Neb. 495, 203 N. W. 2d 445 (1973); Graves v. Bednar, 171 Neb. 499, 107 N. W. 2d 12 (1960); Shiers v. Cowgill, 157 Neb. 265, 59 N. W. 2d 407 (1953); Darner v. Daggett, 35 Neb. 695, 53 N. W. 608 (1892); § 25-1116, R. R. S. 1943. However such action should be taken in the presence of or after notice to the parties or their counsel. Taulborg v. Andresen, 119 Neb. 273, 228 N. W. 528 (1930); § 25-1116, R. R. S. 1943. Defendant contends that he was not given notice of the reading of the deposition to the jury, but the record reflects to the contrary. An affidavit of the bailiff, which appears in the record, reveals that the bailiff left calls at the offices of both attorneys late in the afternoon, but that counsel for the defendant did not return his call. It further appears that the following morning counsel walked into the courtroom where the deposition was being read by the court reporter, and saw and heard it being read, but made no objections of any kind thereto at that time. Defendant's contention in this regard is without merit.

With regard to defendant's contention that error was committed because the judge was not present in the courtroom at the reading of the deposition referred to, it is true that as a general rule the judge is required to be present at all stages of the trial. Egenberger v. National Alfalfa Dehydrating & Milling Co., 164 Neb. 704, 83 N. W. 2d 523 (1957); 75 Am. Jur. 2d, Trial, § 45, p. 158. In this case, however, the judge had commenced another trial and was not present during the reading of the deposition. The reading of the testimony was purely a mechanical function which involved no discretion on the part of the parties performing it, and the conduct

of the bailiff and court reporter during the reading was above reproach, as substantiated by an affidavit contained in the record. Also at the hearing on defendant's motion for a new trial the court offered to place the court reporter under oath and allow defense counsel to examine him if counsel felt anything improper had transpired. The offer of the court was declined by counsel. It is our conclusion that no prejudice resulted to the defendant because of the absence of the judge during the reading of the deposition in question, and that no reversible error was committed.

With regard to defendant's further claim that the action on the part of certain of the jurors in bringing their consultation notes into the courtroom and taking additional notes during the reading of the deposition constituted error, we note that the taking of notes of the testimony of a witness by jurors has never been prohibited in this state, although it has been held that such practice was frowned upon and *may* constitute prejudicial error. Swift & Co. v. Bleise, 63 Neb. 739, 89 N. W. 310 (1902); Omaha Fire Ins. Co. v. Crighton, 50 Neb. 314, 69 N. W. 766 (1897); 75 Am. Jur. 2d, Trial, § 934, p. 795. The validity of an objection to the taking of such notes by jurors would seem to be based upon the subsequent use of such notes. See Annotation, 14 A. L. R. 3d 831. In this case the defendant's counsel had almost 3 weeks before argument for new trial to obtain evidence regarding the use of such notes after the jury returned to the jury room, but there is no showing in the record that the notes were used, and no showing of prejudice to the defendant. We therefore rule against the defendant on this contention also.

In view of what we have stated above, we have concluded that no reversible error occurred during this trial, and that the verdict of the jury and judgment thereon by the court should be and hereby is affirmed.

AFFIRMED.