Earl Otis WRIGHT, Appellee,

v.

**STATE BOARD OF ENGINEERING EXAMINERS, Appellant.**

No. 2–57795.

Supreme Court of Iowa.

Feb. 16, 1977.

Gary S. Gill, of Swift, Brown & Winick, Des Moines, for appellant.

David J. Grace, of Davis, Scott & Grace, Des Moines, and William Bartley, Iowa City, for appellee.

Heard by MOORE, C. J., and MASON, REYNOLDSON, HARRIS and McCORMICK, JJ.

McCORMICK, Justice.

The trial court sustained a certiorari challenge to the revocation of plaintiff's registration as a professional engineer by defendant state board of engineering examiners. The determinative questions on appeal are whether the trial court erred in interpreting the statutory grounds of revocation and in holding the revocation was unsupported by substantial evidence. We reverse.

Registration of professional engineers and land surveyors in Iowa is regulated in Code chapter 114. At all times material here plaintiff Earl Otis Wright was a registered professional engineer. In 1972 written charges were filed against Wright with the board by Gary W. Nelson, alleging Wright was guilty of gross negligence, incompetence and misconduct in submission to city building inspectors of structural designs for buildings to be constructed in Iowa City and Dubuque. The charges were tried in a contested proceeding before the board in accordance with Code § 114.22.

The board held the evidence was insufficient to establish the charge in relation to the Iowa City design but did establish Wright was guilty of misconduct with respect to the Dubuque design. His registration as a professional engineer was revoked.

Wright subsequently challenged the legality of the revocation order in a certiorari proceeding in district court. He obtained a temporary stay of the order and, upon trial, the trial court sustained the writ. The principal grounds of the court's holding were that the board erred in not requiring a showing of gross misconduct as a ground for discipline and that the evidence before the board was insufficient to support revocation. These determinations are attacked in this appeal. The first question requires statutory interpretation and the second requires examination of the evidence before the board.

I. The statutory provision applicable here is § 114.21, The Code, 1971:

The board shall have the power by a four-fifths vote of the entire board to suspend for a period not exceeding two years, or to revoke the certificate of registration of, or to reprimand any registrant who is found guilty of any fraud or deceit in obtaining a registration, any fraud or deceit in his practice, *or any gross negligence, incompetence, or misconduct in his practice,* or who has been found to have been convicted of any felony or any misdemeanor involving moral turpitude. (italics added).

The italicized language is the same in the present Code. See § 114.21, The Code, 1975.

The trial court interpreted the statute to require gross misconduct rather than lesser misconduct as a basis for discipline. In so doing, the court found the adjective "gross" modified the words "negligence", "incompetence" and "misconduct", in the phrase "any gross negligence, incompetence, or misconduct."

■ Wright defends the court's interpretation by relying on the rule of *noscitur a sociis.* Under this guide to interpretation the meaning of a word is ascertained in the light of the meaning of words with which it is associated. See *State v. Bauer,* 236 Iowa 1020, 20 N.W.2d 431 (1945). Wright contends only gross incompetence and gross misconduct have gravity equivalent to gross negligence, and he reasons that the legislature did not intend to authorize revocation of a professional engineer's registration on less serious grounds.

General principles of statutory interpretation are summarized in *Iowa National Industrial Loan Company v. Iowa State Department of Revenue*, 224 N.W.2d 437, 439–440 (Iowa 1974). Their purpose is to provide guidance in searching for legislative intent. The rule of *noscitur a sociis* is simply one of many devices which are available to assist in that search. 2A Sutherland Statutory Construction § 47.16 (Fourth Ed. 1973). Applying these principles in the present case, we conclude the trial court erred in holding the statute requires a finding of gross misconduct as opposed to ordinary misconduct as a ground for discipline. We believe the adjective "gross" modifies only the negligence ground.

Permissible discipline under § 114.21 ranges from reprimand to revocation. It logically follows that grounds of discipline were intended to range from slight to serious breaches of professional duty. It is unlikely the legislature intended misconduct less than gross misconduct would not be subject to so much as a reprimand.

Examination of the ground of incompetence makes this even clearer. Under Wright's interpretation an engineer could not be disciplined for incompetence less than gross incompetence. We do not believe the legislature intended to absolve any professional engineers who are incompetent from the risk of discipline. By definition a professional engineer is required to be competent. § 114.2, The Code. Unless he is competent he is not to be registered. § 114.14, The Code. It would be inconsistent for the legislature to require a demonstration of competence as a prerequisite to registration but not to authorize discipline for a demonstration of incompetence after registration.

Application of the rule of *noscitur a sociis* does not support Wright's contention. Incompetence and misconduct are breaches of professional duty at least as serious as gross negligence. Gross negligence is substantially greater than simple inadvertence but falls short of intentional wrong. *Young v. City of Worcester*, 253 Mass. 481, 149 N.E. 204 (1925). Misconduct implies the willful doing of an act with a wrongful intention. It involves intentional wrongdoing. *Mandella v. Mariano*, 61 R.I. 163, 200 A. 478 (1938). Black's Law Dictionary 1150 (Fourth Ed.1968) defines misconduct as "[a] transgression of some established and definite rule of action, a forbidden act, a dereliction from duty, unlawful behavior, willful in character, improper or wrong behavior; * * *." The same authority defines incompetency as "[l]ack of ability, legal qualification, or fitness to discharge the required duty." *Id.* at 906. Judging the meaning of the word "misconduct" by its relationship to associated words in §114.21, we do not believe it is limited to gross misconduct.

The trial court erred in holding otherwise.

II. In finding Wright was guilty of misconduct, the board relied on the following evidence. The building code of the City of Dubuque required roofs of buildings, whether flat or pitched, to be designed for a snow load of not less than 30 pounds per square foot of horizontal projection. This capacity is in addition to the weight of the roof itself, called dead load, and in addition to wind or other loads. No reduction in snow load capacity was authorized. The Dubuque building inspector at the time of these events was not a professional engineer.

In February 1972 Wright filed plans with the inspector for a pole building to be constructed for a Dubuque yacht club. On the first page of the plans, under a heading "TRUSS DESIGN CRITERIA AND REFERENCES," he showed:

```
LOADING:  WIND  —  85 M.P.H., 25 psf.
          SNOW  —  30 psf Zone II
          DEAD  —  3.0 psf (Truss spacing
                   8′ 0″ oc.)
```

Then he described the materials to be employed, references, a load test, and finally:

MAXIMUM STRESS: Occurs from SNOW plus DEAD LOAD.
w equals 17.5 plus 3.0 or 20.5 psf.

\*     \*     \*     \*     \*     \*     \*

Stapled to the second page of the plans as an addendum was a letter stating in part, "This nailed and glued plywood gusset truss is designed for 30 lbs. per square ft. live snow load and 85 mph windload in accordance with the Iowa State University, Midwest Plan Service bulletin # TR–1."

The Dubuque building inspector told Wright that any plans furnished under the certificate and seal of a registered engineer would be accepted. In fact, Wright's plans were so certified and sealed, and they were accepted.

However, the plans actually were for a truss having a design snow load of 17.5 pounds per square foot rather than 30 pounds per square foot as required by the ordinance. The ratio of working stress to rupture point in Wright's plans was below the reasonable safety factor range for a snow load of 30 pounds per square foot.

Nevertheless, the plans did conform with criteria in Midwest Plan Service TR–1, a bulletin of Iowa State University containing recommended design criteria for agricultural buildings. Under criteria in that bulletin a pitched roof designed for 17.5 pounds per square foot of snow load would be the equivalent of a flat roof designed for a snow load of 30 pounds per square foot.

The board made the following findings from the evidence:

1. Sound engineering practice dictates that a minimum live (snow) load of 30 pounds per square foot be incorporated in the design of trusses for structures in Dubuque, Iowa. Approbation for this practice is to be found in the Dubuque Building Code requirement that roofs be designed for 30 pounds of snow load in addition to dead load. Thirty pounds of snow load is not an unlikely occurrence for Dubuque, Iowa, and the unequivocal Code prohibition against live load reduction underscores the necessity for such design loading in order to protect the public from structural failure.

2. On the face of his plans it would appear that Mr. WRIGHT designed the building in compliance with the Dubuque Building Code, and the City Building Inspector likely thought this was the case. Indeed, the stated design criteria leave no room to doubt that the snow load was other than as specified. When called as an expert defense witness by the Respondent, Dr. Bernard Meyers admitted that upon seeing a stated design criterion "LOADING; SNOW—30 pfs." he would assume that snow load in that quantity had been used in the design. \* \* \* Not until an analysis of the design is made by one competent to do so does it become apparent that a significantly different snow load was employed.

3. A statement of design loads normally is included in building plans for two reasons:

   a. These data provided a basis for subsequent analysis of the structural design by persons contemplating future repairs, alterations, or additions to the building. For example, before an overhead crane could be added to a structure, it would be necessary to determine whether the existing structural system could support the additional weight.

   b. Loading conditions aid official plan reviews such as those required for issuance of a building permit.

Sound engineering practice knows no other valid reason for stating design loads than for use in stress evaluation.

4. Mr. WRIGHT possesses impressive academic credentials. As a witness, he displays an ability to grasp engineering concepts, and he is able to articulate abstractions with facility—an ability which may have been assisted by his legal education. There is no reason to doubt that he was quite familiar with the reasons for setting forth design loading in engineering drawings. Thus, it is not possible to excuse his palpable misstatement of design snow loads as if it were the unfortunate product of a communication deficiency.

5. Mr. WRIGHT knew that regardless what his plans actually provided, the Dubuque Building Inspector was not likely to know. In fact, he knew that the Inspector would approve any plans submitted by the Professional Engineer. Given the presence of an Engineer's Certificate and Seal, the lay public has an implicit right to believe that statements in the documents are accurate. Further, they have the right to believe their interests have received the designer's foremost consideration.

6. Mr. WRIGHT's plans for the Dubuque building are intentionally misleading. They specify one set of maximum loads, but in actuality, they employ greatly reduced total loads. Mr. WRIGHT well knew that the Dubuque Building Code required minimal roof loading at 30 pounds per square foot in accordance with widely accepted standards for use in designing buildings. Nevertheless, he designed the structure for greatly reduced loading, which produced unsafe stresses under normal design loads. * * * To obfuscate those who might examine his plans for structural adequacy, he specified design loading at 30 pounds.

7. Mr. WRIGHT's misleading plans constitute an overt betrayal of the public trust implicit to the privilege of practicing professional engineering. His designs fall short of the standards required by the Dubuque Building Code and they are an unprofessional gamble with the forces of nature. Equally important, they represent a deception perpetrated with the aid of his Certificate and Seal.

On this basis, the board held Wright was guilty of misconduct and ordered his registration revoked.

In the subsequent district court certiorari action, the trial court held the adjudication of misconduct was illegal because not supported by sufficient evidence. This holding of illegality must be tested against principles governing ordinary certiorari proceedings. The administrative procedure act was enacted subsequent to the litigation here and is not involved. See Code chapter 17A.

This situation must also be distinguished from certiorari proceedings in which statutes impose a different mode of review. See, e. g., *Trailer City, Inc. v. Board of Adjustment,* 218 N.W.2d 645, 646–648 (Iowa 1974).

Where unaffected by statute, as here, certiorari provides only limited review of administrative action. Illegality within the meaning of the certiorari rule may be established when it is shown that the findings of fact on which the inferior tribunal based its conclusions of law were not supported by substantial evidence. However, the evidence to support the findings is sufficient if it is substantial. The fact that others may have reached a different conclusion or that an opposite result would have been fully justified by the evidence is of no significance. *Vohs v. District Commissioners of Fremont County,* 218 N.W.2d 595, 596 (Iowa 1974).

In *Grant v. Fritz,* 201 N.W.2d 188, 197 (Iowa 1972), we approved a definition of substantial evidence as evidence which, if true, has sufficient probative force to permit a reasonable person to find it establishes a fact at issue.

We think the board's findings were supported by substantial evidence in this case. In contending otherwise, Wright argues his plans may have been ambiguous but were not intentionally misleading. Although the board might have found the plans were merely ambiguous, it was not constrained by the evidence to do so. The issue of intent was peculiarly for the trier of fact in these circumstances. Wright did not demonstrate the board acted illegally on the ground its decision was not supported by substantial evidence.

The trial court erred in sustaining the writ of certiorari.

REVERSED.