STATE OF NEBRASKA, APPELLEE, V. ROBERT L. KIPF, APPELLANT.

450 N.W.2d 397

Filed January 19, 1990.   No. 88-974.

228

Dennis R. Keefe, Lancaster County Public Defender, and Robert G. Hays for appellant.

Robert M. Spire, Attorney General, and Terri M. Weeks for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

## I. INTRODUCTION

Defendant, Robert L. Kipf, was convicted in the county court of intimidation by telephone call, a Class III misdemeanor, in violation of Neb. Rev. Stat. § 28-1310(1)(b) (Reissue 1985), which conviction was affirmed by the district court. In his appeal to this court, Kipf assigns 18 errors, which can be summarized as claiming that the district court erred by failing to find the county judge erred (1) in failing to sustain Kipf's motion to quash the complaint on the ground the subject statute is unconstitutional and by subsequently mischarging the jury in reliance upon the statute's unconstitutional language and (2) in permitting the jurors to take notes during the course of the trial for use during their deliberations and in refusing to preserve the notes for review. We reverse and remand for a new trial.

## II. BACKGROUND

The challenged portions of § 28-1310 provide:

(1) A person commits the offense of intimidation by phone call if with intent to terrify, intimidate, threaten, harass, annoy, or offend, he:

. . . .

(b) Telephones another and uses indecent, lewd,

lascivious, or obscene language or suggests any indecent, lewd, or lascivious act . . .

. . . .

(2) The use of indecent, lewd, or obscene language or the making of a threat or lewd suggestion shall be prima facie evidence of intent to terrify, intimidate, threaten, harass, annoy, or offend.

In addition to Kipf's failed effort to have the complaint quashed, he, at the commencement of the trial, unsuccessfully objected to the taking of notes by jurors for use during their deliberations. Kipf then unsuccessfully moved that the notes be preserved for purposes of appeal.

The evidence adduced reveals that for a period of approximately 6 to 8 months, the prosecuting witness had been receiving bothersome telephone calls at her residence at various times of the day, including the early morning hours, at the rate of about one call a week. Each time she recognized the voice as that of the same male caller, who never identified himself to her.

The prosecuting witness described the calls as harassing and stated that the caller said "nasty" things. On one occasion the caller told her, " 'I'd like to put my cock in your pussy,' " and on another occasion stated, " 'Hi babe, whatcha doing, can I come over?' " Normally, the prosecuting witness reacted to the calls by disengaging the connection. At least once, she asked the caller to stop calling, to which request the caller snickered. In response to one of the calls, the prosecuting witness was herself moved to ask the caller, " '[W]hy don't you go get screwed?' "

At the request of the prosecuting witness, the telephone company serving her residence traced the calls on her line. During the period of this surveillance, the caller rang the prosecuting witness twice, thereby enabling the telephone company to identify the subscriber of the number from which the calls were placed.

A police officer for the city of Lincoln then investigated at the subscriber's residence, which she apparently shared with Kipf. After initially denying that he had made the calls, Kipf admitted having done so. He insisted, however, that he could neither identify the number he called nor remember what exactly he had said. The prosecuting witness testified that Kipf's

calls frightened and annoyed her.

Kipf's tendered instructions concentrated on definitions for the words "indecent," "lewd," "lascivious," and "obscene" used in § 28-1310. Without request by either party, the court instructed that as to the burden of proof:

>The defendant is presumed to be innocent.

>This presumption of innocence is evidence in favor of the defendant and continues throughout the trial, until he shall have been proved guilty beyond a reasonable doubt.

That:

>The material elements which the State must prove by evidence beyond a reasonable doubt in order to convict the defendant of the crime charged are:

>1. That between April 1, 1987 and October 24, 1987 the defendant did telephone [the prosecuting witness].

>2. That in such telephone call or calls the defendant did use indecent, lewd, lascivious or obscene language, or did suggest an indecent, lewd or lascivious act.

>3. That the defendant intended to intimidate, threaten, harass, annoy, or offend the said [prosecuting witness].

>4. That said act or acts occurred in Lancaster County, Nebraska.

>The State has the burden of proving beyond a reasonable doubt each and every one of the foregoing material elements necessary for conviction.

>If you find from the evidence, beyond a reasonable doubt, that each of the foregoing material elements has been proven, it is your duty to find the defendant guilty. On the other hand, if you find the State has failed to prove beyond a reasonable doubt any one or more of the foregoing material elements, it is your duty to find the defendant not guilty.

>The burden of proof is always on the State to prove beyond a reasonable doubt all of the material elements of the crime charged, and this burden never shifts.

And that:

>The use of indecent, lewd or obscene language or the making of a threat or lewd suggestion is prima facie evidence of the intent to terrify, intimidate, threaten,

harass, annoy, or offend.

Kipf objected to the last of the three instructions set forth above.

## III. ANALYSIS
### 1. Motion to Quash and Jury Charge

Kipf's contention that the county judge erred in failing to quash the complaint against him rests on the claim that § 28-1310 is unconstitutional in that the language of subsections (1)(b) and (2) is vague, the language of subsection (1)(b) is overbroad, and subsection (2) impermissibly shifts the burden of proof.

We begin that analysis by recalling that statutes are afforded a presumption of constitutionality and that the unconstitutionality of a statute must be clearly established before this court may declare it void. Moreover, we are required to construe a penal statute so as to give it an interpretation which meets constitutional requirements if such can reasonably be done. *State v. Burke*, 225 Neb. 625, 408 N.W.2d 239 (1987); *State v. Copple*, 224 Neb. 672, 401 N.W.2d 141 (1987).

### a. Vagueness Claim

Kipf claims that subsection (1)(b) of § 28-1310 is impermissibly vague "with respect to both the type of speech which is proscribed and the nature of the result intended by the actor," brief for appellant at 11, in violation of the due process clauses of the 5th and 14th amendments to the U.S. Constitution and article I, § 3, of the Nebraska Constitution.

The traditional rule of standing applies to first amendment challenges to a statute on the ground of vagueness. That is, one who has engaged in conduct which is clearly prohibited by the questioned statute cannot complain that the statute is vague when applied to the conduct of others. *State v. Burke, supra*; *New York v. Ferber*, 458 U.S. 747, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (1982). It has been observed that this rule of standing reflects both the personal nature of constitutional rights and the prudential limitations on constitutional adjudication. *State v. Burke, supra*.

While, in affording legislative enactments a presumption of constitutionality, we construe penal statutes strictly, we

nonetheless give them a sensible construction in the context of the object the Legislature sought to accomplish, the evils and mischiefs it sought to remedy, and the purpose it sought to serve. *State v. Comeau,* 233 Neb. 907, 448 N.W.2d 595 (1989); *State v. Ring,* 233 Neb. 720, 447 N.W.2d 908 (1989); *State v. Burke, supra.* There is no question but that to meet the due process requirements of the federal and Nebraska Constitutions, a penal statute must define the proscribed conduct with sufficient clarity so as to provide a person of ordinary intelligence with fair notice of exactly what is forbidden, *State v. Burke, supra,* and so as not to permit arbitrary and discriminatory enforcement, *State v. Monastero,* 228 Neb. 818, 424 N.W.2d 837 (1988), *appeal dismissed* 488 U.S. 936, 109 S. Ct. 358, 102 L. Ed. 2d 349. See, also, *State v. Reichstein,* 233 Neb. 715, 447 N.W.2d 635 (1989).

Thus, we must first determine what language the statute seeks to proscribe and then determine whether it does so in sufficiently clear terms. In making those determinations, we need to be mindful that, like people, words are known by the company they keep, *Jarecki v. G. D. Searle & Co.,* 367 U.S. 303, 81 S. Ct. 1579, 6 L. Ed. 2d 859 (1961), and thus take meaning from the words with which they are associated, *People v. Parkins,* 77 Ill. 2d 253, 396 N.E.2d 22 (1979), *appeal dismissed* 446 U.S. 901, 100 S. Ct. 1825, 64 L. Ed. 2d 254 (1980). Consequently, words grouped in a list should be given related meaning. *Schreiber v. Burlington Northern, Inc.,* 472 U.S. 1, 105 S. Ct. 2458, 86 L. Ed. 2d 1 (1985); *Third National Bank v. Impac Limited, Inc.,* 432 U.S. 312, 97 S. Ct. 2307, 53 L. Ed. 2d 368 (1977). See *Wright v. State Bd. of Engineering Examiners,* 250 N.W.2d 412 (Iowa 1977).

Each of the words in the phrase "indecent, lewd, lascivious, or obscene," found in the first prohibition of § 28-1310(1)(b), has sexual connotations. Included in the common, everyday meaning of "indecent" is that which tends to be obscene and which is morally indelicate. Webster's Third New International Dictionary, Unabridged 1147 (1981). The word "lewd" characterizes, among other things, that which incites sensual desire or imagination. *Id.* at 1301. This court has said that lewd denotes an " 'unlawful indulgence of lust, dissolute, lustful,

filthy . . . .' " *State v. Lawrence*, 19 Neb. 307, 313, 27 N.W. 126, 129 (1886). "Lascivious" is commonly understood to mean that which is lewd or lustful. Webster's at 1274. In *Purvis v. State*, 117 Neb. 377, 220 N.W. 599 (1928), this court said lascivious was synonymous with "licentious," which is defined, among other things, as that marked with lewdness. Webster's at 1304. And a common meaning of the word "obscene" is to revel in the lewd or lustful. *Id*. at 1557.

Kipf's suggestion that the words indecent, lewd, and lascivious should all be read as obscene and that obscene should be defined in accordance with the standard set forth in *Miller v. California*, 413 U.S. 15, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973), *reh'g denied* 414 U.S. 881, 94 S. Ct. 26, 38 L. Ed. 2d 128, is without merit. *Miller*, which dealt with the mailing of materials advertising books and a film, characterizes as obscene those materials "which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value." 413 U.S. at 24. See, also, *State v. Embassy Corp.*, 215 Neb. 631, 340 N.W.2d 160 (1983); *Midtown Palace, Inc. v. City of Omaha*, 193 Neb. 785, 229 N.W.2d 56 (1975).

However, a telephone harassment statute deals with different concerns than do statutes which seek to control literary or artistic content. It would be foolish indeed to attempt to determine whether a sensual telephone conversation had a redeeming social value by possessing serious literary, artistic, political, or scientific content. See, *State v. Crelly*, 313 N.W.2d 455 (S.D. 1981); *State v. Jaeger*, 249 N.W.2d 688 (Iowa 1977); *State v. Keaton*, 371 So. 2d 86 (Fla. 1979); *Baker v. State*, 16 Ariz. App. 463, 494 P.2d 68 (1972); *State v. Starsky*, 106 Ariz. 329, 475 P.2d 943 (1970); *People v. Cirruzzo*, 53 Misc. 2d 995, 281 N.Y.S.2d 562 (1967); *People v. Anonymous*, 52 Misc. 2d 772, 276 N.Y.S.2d 717 (1965). Accordingly, the *Miller* definition of obscenity simply has no application to the statute at hand.

Thus, what is prohibited by the phrase in question is the use of language which conjures up repugnant sexual images. True enough, coitus performed under appropriate circumstances as

an expression of love is natural and fulfilling and not repugnant; thus, conjuring up an image of such an act cannot be said to be repugnant. However, coitus performed as an act of violence is indeed repugnant, so much so that it is criminal. See Neb. Rev. Stat. § 28-319 (Reissue 1985). Moreover, an otherwise natural and fulfilling sexual act may be repugnant because of the known or unknown identity of the other actual or would-be participant. An even more important consideration, given that the statute concerns itself with the use of language, is that even a natural and fulfilling sexual act can be described in terms which are repugnant.

Using the same analysis as applied to the language of the first prohibition of § 28-1310(1)(b), the second prohibition of that statutory clause, that of suggesting any "indecent, lewd, or lascivious" act, proscribes the use of language which proposes the performance of any repugnant sexual act.

The question we must next ask is, What intended result does § 28-1310 prohibit? We begin by recalling that intent is the state of mind operative at the time of an action and may be inferred from the words and acts of an accused and from the facts and circumstances surrounding the conduct. *State v. Robb*, 224 Neb. 14, 395 N.W.2d 534 (1986). In the context of a criminal statute, that which is done willfully or purposefully, rather than accidentally or involuntarily, is done intentionally. *State v. Schott*, 222 Neb. 456, 384 N.W.2d 620 (1986).

The words "terrify," "intimidate," "threaten," "harass," "annoy," and "offend" all describe the same species of behavior. To "terrify" is to fill with terror, to frighten greatly. Webster's Third New International Dictionary, Unabridged 2360 (1981). To "intimidate" is to frighten. *Id*. at 1184. To "threaten" is to promise punishment, reprisal, or other distress. *State v. Methe*, 228 Neb. 468, 422 N.W.2d 803 (1988); Webster's at 2382. In *McKenzie v. State*, 113 Neb. 576, 204 N.W. 60 (1925), we characterized the term in the criminal law to be a declaration of one's purpose to work injury to the person, property, or rights of another. Later, in *State v. Maez*, 204 Neb. 129, 281 N.W.2d 531 (1979), we said that the term "threaten" does not, in and of itself, necessarily import an unlawful act and must therefore be restricted in its meaning in the light of the

objective or purpose sought to be accomplished by the threats. To "harass" is to vex, trouble, or annoy continually or chronically. Webster's at 1031. To "annoy" is to harass, to irritate with a nettling or exasperating effect, especially by being a continuous or repeatedly renewed source of vexation. *Id.* at 87. To "offend" is to cause difficulty, discomfort, or injury. *Id.* at 1566. Thus, § 28-1310(1) concerns itself with the making of telephone calls which are designed to inflict mental discomfort.

The portions of the statute before us are therefore not impermissibly vague—they give fair notice of exactly what is forbidden in terms which are understandable to persons of ordinary intelligence.

### b. Overbreadth Claim

Kipf also contends that subsection (1)(b) of § 28-1310 is overbroad "in that it interferes with constitutionally protected speech," brief for appellant at 11, in violation of the first amendment to the U.S. Constitution and article I, § 5, of the Nebraska Constitution.

We have held that article I, § 5, providing that every person "may freely speak . . . being responsible for the abuse of that liberty," does not provide any greater protection regarding the overbreadth of statutes than does the 1st amendment to the U.S. Constitution, which prohibits the Congress and, through the 14th amendment, the several states from making any law "abridging the freedom of speech." *In re Interest of Siebert*, 223 Neb. 454, 390 N.W.2d 522 (1986).

### (i) *Standing*

The first amendment doctrine of substantial overbreadth provides an exception to the traditional rule of standing discussed in part III(1)(a) above. *Massachusetts v. Oakes*, \_\_\_\_ U.S. \_\_\_\_, 109 S. Ct. 2633, 105 L. Ed. 2d 493 (1989); *State v. Burke*, 225 Neb. 625, 408 N.W.2d 239 (1987). Under that doctrine, an individual whose own speech or conduct may be prohibited is permitted to challenge a statute on its face because it also threatens others not before the court—those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid. *Airport Comm'rs v. Jews for*

*Jesus, Inc.*, 482 U.S. 569, 107 S. Ct. 2568, 96 L. Ed. 2d 500 (1987).

A statute may be invalidated on its face, however, only if its overbreadth is "substantial," i.e., when the statute is unconstitutional in a substantial portion of cases to which it applies. *Airport Comm'rs v. Jews for Jesus, Inc., supra*; *Regan v. Time, Inc.*, 468 U.S. 641, 104 S. Ct. 3262, 82 L. Ed. 2d 487 (1984); *State v. Monastero,* 228 Neb. 818, 424 N.W.2d 837 (1988), *appeal dismissed* 488 U.S. 936, 109 S. Ct. 358, 102 L. Ed. 2d 349; *State v. Burke, supra*; *State v. Copple,* 224 Neb. 672, 401 N.W.2d 141 (1987). Stated another way, in order to prevail upon a facial attack to the constitutionality of a statute, the challenger must show either that every application of the statute creates an impermissible risk of suppression of ideas or that the statute is "substantially" overbroad, which requires the court to find a realistic danger that the statute itself will significantly compromise recognized first amendment protections of parties not before the court. *New York State Club Assn. v. New York City,* 487 U.S. 1, 108 S. Ct. 2225, 101 L. Ed. 2d 1 (1988). The requirement that the overbreadth be substantial arose from a recognition that the application of the overbreadth doctrine is " 'manifestly strong medicine,' " and that " 'there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds.' " *Airport Comm'rs v. Jews for Jesus, Inc., supra* at 574. Accordingly, a litigant must show that the statute is substantially overbroad before he or she is deemed to have standing to challenge it on the ground it is unconstitutional with respect to a hypothetical party. *Secretary of State of Md. v. J. H. Munson Co.,* 467 U.S. 947, 104 S. Ct. 2839, 81 L. Ed. 2d 786 (1984).

### (ii) *General First Amendment Principles*

A statute is unconstitutionally overbroad and thus offends the first amendment if, in addition to forbidding speech or conduct which is not constitutionally protected, it also prohibits the exercise of constitutionally protected speech. See *State v. Copple, supra*. Not all speech is protected by the first

amendment. *State v. Broadstone*, 233 Neb. 595, 447 N.W.2d 30 (1989); *State v. Monastero, supra*; *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S. Ct. 766, 86 L. Ed. 1031 (1942). Material which is obscene, as defined in accordance with the standard set forth in *Miller v. California*, 413 U.S. 15, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973), *reh'g denied* 414 U.S. 881, 94 S. Ct. 26, 38 L. Ed. 2d 128, is not protected by the first amendment. *Miller v. California, supra*; *Roth v. United States*, 354 U.S. 476, 77 S. Ct. 1304, 1 L. Ed. 2d 1498 (1957). However, the U.S. Supreme Court has determined that in order for a statute which regulates the content of speech which is protected by the first amendment to withstand constitutional challenge, the government must show that the regulation is necessary to serve a compelling state interest and that the statute is narrowly drawn to achieve that end. *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 103 S. Ct. 948, 74 L. Ed. 2d 794 (1983); *Widmar v. Vincent*, 454 U.S. 263, 102 S. Ct. 269, 70 L. Ed. 2d 440 (1981).

The U.S. Supreme Court has held that, generally, statements may not be punished merely because they are profane and therefore offensive to listeners, unless substantial privacy interests are at stake. *Cohen v. California*, 403 U.S. 15, 21, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971), *reh'g denied* 404 U.S. 876, 92 S. Ct. 26, 30 L. Ed. 2d 124 ("The ability of the government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is . . . dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner"). That speech is directed toward a captive audience, one which cannot easily avoid exposure to the speech, is a factor to be considered in favor of allowing restriction on the expression. *FCC v. Pacifica Foundation*, 438 U.S. 726, 98 S. Ct. 3026, 57 L. Ed. 2d 1073 (1978), *reh'g denied* 439 U.S. 883, 99 S. Ct. 227, 58 L. Ed. 2d 198; *Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S. Ct. 2714, 41 L. Ed. 2d 770 (1974).

In *FCC v. Pacifica Foundation*, a plurality of the High Court upheld a Federal Communications Commission sanction pursuant to federal statute against a radio station which broadcast obscene, indecent, or profane language during a

monologue entitled "Filthy Words." The Court stated: " '[S]uch utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' " 438 U.S. at 746. Further, "Although these words ordinarily lack literary, political, or scientific value, they are not entirely outside the protection of the First Amendment." *Id.* The Court determined that even speech protected by the first amendment could be prohibited in contexts where it is especially offensive, such as where a broadcast "confronts the citizen, not only in public, but also in the privacy of the home, where the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder." 438 U.S. at 748.

### (iii) *Views of Other Jurisdictions*

Some courts have found statutes containing language similar to that of § 28-1310(1)(b) unconstitutionally overbroad. For example, in *Bolles v. People*, 189 Colo. 394, 541 P.2d 80 (1975), the Colorado Supreme Court declared overbroad a statute prohibiting any communication, whether by telephone, mail, or any other form, made with the intent to harass, annoy, or alarm and in a manner likely to harass or cause alarm. The court noted that if "alarm" means "arouse to a sense of danger," then the statute reached speech entitled to first amendment protection, such as storm forecasts, political trend predictions, or warnings concerning illnesses. *Id.* at 398, 541 P.2d at 83. The *Bolles* court observed that a function of free speech under our system of government is to invite dispute, including unsettling, disturbing, arousing, or annoying communications, and that the absurdity of prohibiting such speech is "patently obvious to anyone who envisions our society in anything but a state of languid repose." *Id.*

*Bolles v. People, supra*, was followed in *Everett v. Moore*, 37 Wash. App. 862, 683 P.2d 617 (1984), wherein the court held that a city ordinance identical to the statute in *Bolles* encroached on constitutionally protected speech. The court stated that although the city "unquestionably has a legitimate and substantial interest in protecting its residents from fear and

abuse at the hands of persons who employ the telephone to torment others . . . and in protecting the privacy of residents' homes from the intrusion of unwanted telephone calls," the statute failed because it was not limited to telephone calls, intrusions into the home, and communications which abuse the listener " 'in an essentially intolerable manner.' " *Everett* at 865-66, 683 P.2d at 619, quoting *Cohen v. California, supra*.

In *State v. Keaton*, 371 So. 2d 86 (Fla. 1979), the court held overbroad a Florida statute prohibiting the use of telephone communication to make any comment, request, suggestion, or proposition which is obscene, lewd, lascivious, filthy, or indecent, because it covered consensual as well as nonconsensual conversations. In dicta, the court observed that the statute would pass constitutional muster if it were limited to calls made to the listener at a location where he enjoys a reasonable expectation of privacy and which were intended to harass the listener.

*State v. Ray*, 302 Or. 595, 733 P.2d 28 (1987), held that a statute which prohibited subjecting another to alarm or annoyance by telephonic use of obscenities or the description of sexual excitement, sadomasochistic abuse, or sexual conduct was overbroad because it was not limited to unwanted, unsolicited, or nonconsensual calls nor to the person placing the call and thus could prohibit calls between spouses, lovers, or friends that may from time to time cause annoyance; consensual calls from legitimate polling organizations collecting data on attitudes pertaining to sexual matters; and discussions between patients and doctors concerning sexual matters which cause alarm.

Other courts have found similar statutes which include a specific intent element not to be overbroad. For example, in *State v. Hagen*, 27 Ariz. App. 722, 558 P.2d 750 (1976), the court upheld a statute which makes it unlawful for any person to telephone another and use any obscene, lewd, or profane language or suggest a lewd or lascivious act with the intent to terrify, intimidate, threaten, harass, annoy, or offend. The court determined that the state has a legitimate interest in prohibiting obscene, threatening, or harassing telephone calls, none of which are protected by the first amendment, and

concluded that because the statute specifies the intent with which the calls must be made and the nature of the language prohibited, the statute reaches no speech protected by the first amendment.

A similar holding is found in *United States v. Lampley*, 573 F.2d 783 (3d Cir. 1978). There, the court upheld against an overbreadth challenge 47 U.S.C. § 223(1)(D) (1982), which prohibits making repeated telephone calls, during which conversation ensues, solely to harass any person at the called number. The court observed that Congress has power to impose criminal sanctions on the placement of interstate telephone calls made with the intent to harass, abuse, or annoy, stating: "Congress ha[s] a compelling interest in the protection of innocent individuals from fear, abuse or annoyance at the hands of persons who employ the telephone, not to communicate, but for other unjustifiable motives." 573 F.2d at 787.

*State v. Gattis*, 105 N.M. 194, 730 P.2d 497 (1986), held that a statute which proscribes obscene telephone calls initiated by one with the intent and sole purpose of conveying an unsolicited, obscene, imminently threatening, or harassing message to an unwilling recipient did not encroach on the first amendment.

In *State v. Koetting*, 691 S.W.2d 328 (Mo. App. 1985), the court considered the constitutionality of a statute prohibiting the making of repeated telephone calls if done for the purpose of frightening or disturbing another person. Limiting the statute to language directed to a specific individual in the privacy of her or his home or business, the court held that the government had a compelling state interest in protecting the privacy rights of its citizens and thus could regulate speech content.

The Illinois experience is most instructive. In *People v. Klick*, 66 Ill. 2d 269, 362 N.E.2d 329 (1977), upon which Kipf places major reliance, the court declared overbroad a disorderly conduct statute prohibiting telephone calls made with the intent to annoy another, irrespective of whether conversation thereby ensues. Applying the rule that a statute is overly broad if it may reasonably be interpreted to prohibit conduct which is

constitutionally protected, the court determined that because the subject statute applied to any call made with the intent to annoy, it was too broad. Although recognizing that the state has a legitimate interest in protecting the privacy of its citizens from unwanted telephone intrusions, the court observed that first amendment protection is not limited to amiable communications, but must be considered to extend to consumer complaints, contractual disputes among businessmen, and citizen complaints to public officials, as well as family quarrels. In answer to the state's contention that one's right to communicate must be balanced against another's right to privacy in his home, the court, relying on *Cohen v. California*, 403 U.S. 15, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971), *reh'g denied* 404 U.S. 876, 92 S. Ct. 26, 30 L. Ed. 2d 124, ruled that the ability of government to shut off discourse solely to protect others from hearing it is dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner and observed that the statute was not limited to intolerable conduct, nor was it limited to calls made to private homes. Subsequent to that decision, the Illinois statute was rewritten to prohibit telephone calls made with *the intent to abuse, threaten, or harass*, rather than with the intent to annoy, and the court upheld the statute, holding that the words "abuse" and "harass" take color from, and were narrowed by, the word "threaten." *People v. Parkins*, 77 Ill. 2d 253, 396 N.E.2d 22 (1979), *appeal dismissed* 446 U.S. 901, 100 S. Ct. 1825, 64 L. Ed. 2d 254 (1980).

### (iv) *Section 28-1310(1)(b) Not Overbroad*

As determined in part III(1)(a) of this opinion, § 28-1310(1)(b) proscribes only telephone calls made with the intention of causing mental discomfort by the use of language which conjures up repugnant sexual images or which suggests the performance of repugnant sexual acts. The statute thus concerns itself with sexual speech which intrudes upon the privacy of innocent citizens, not for the purpose of communicating any thought, but for the purpose of causing mental discomfort by conjuring up repugnant sexual images. It therefore regulates in an area in which the State has a

compelling interest. *United States v. Lampley*, 573 F.2d 783 (3d Cir. 1978). Accordingly, Kipf has failed to establish that § 28-1310(1)(b) creates in every application an impermissible risk of suppressing ideas or that it is otherwise "substantially" overbroad. To the extent that an overbreadth problem should arise in isolated cases, the appropriate remedy is to handle such cases on an individual basis to prevent any restriction on constitutionally protected speech rather than striking down in toto a statute prohibiting constitutionally unprotected speech. *People v Taravella*, 133 Mich. App. 515, 350 N.W.2d 780 (1984).

### c. Burden of Proof

Kipf next contends that § 28-1310(2), applied in his case through the instruction concerning "prima facie" evidence of intent, involves a mandatory conclusive presumption of criminal intent and "violates due process by impermissibly shifting the burden of proof from the State to the defendant on the material element of intent." Brief for appellant at 24.

In substance, § 28-1310 makes it a crime for one who has the intent to terrify, intimidate, threaten, harass, annoy, or offend another to use the telephone for communication of certain statutorily prohibited language. An essential element of the crime is the intent with which one communicates the proscribed language to another. Unless the telephone caller intends to produce a particular reaction in the recipient of the communication, such as the recipient's terror, intimidation, or annoyance, the caller does not commit the crime described in § 28-1310. Under § 28-1310(2), the telephone caller's criminal intent, as an element of the offense, "shall" exist or, more simply, has been conclusively established by two facts—the telephone call and the prohibited content of the call.

A presumption is an assumption of fact made from another fact or group of facts found or otherwise established. Prima facie proof is evidence sufficient to submit an issue to the fact finder and precludes a directed verdict on the issue. See *State v. Copple*, 224 Neb. 672, 401 N.W.2d 141 (1987). Cf. *State v. Stalder*, 231 Neb. 896, 906, 438 N.W.2d 498, 505 (1989): "The concept of 'prima facie evidence' is usually one for the trial

judge to use in determining if there is sufficient evidence to send the case to the jury." Thus, the distinction between a presumption and prima facie evidence or proof is readily discernible: A presumption is utilized by the fact finder, whereas prima facie evidence or proof and, correspondingly, a prima facie case are utilized by a court for the legal determination whether a matter, including a particular issue or an entire case, is submissible for determination to the fact finder notwithstanding a request for a directed verdict, or even dismissal, in an action.

Although § 28-1310(2) contains the phrase "prima facie evidence," in view of the distinction between a presumption and prima facie evidence or proof, as noted above, we conclude that an instruction patterned on § 28-1310(2) results in a mandatory and conclusive presumption of criminal intent, that is, factual establishment of the telephone call with its statutorily prohibited conduct necessarily ("shall") results in the conclusively established criminal intent of the caller.

Since *In re Winship*, 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970), due process in a criminal case requires the prosecution to prove beyond a reasonable doubt "every fact necessary to constitute the crime" charged against the defendant. 397 U.S. at 364.

In *Sandstrom v. Montana*, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979), the Supreme Court examined the conviction of David Sandstrom, whom a jury found guilty of " 'deliberate homicide' " in that he " 'purposely or knowingly' " caused the victim's death. 442 U.S. at 512. At trial, Sandstrom claimed that he did not purposely or knowingly kill the victim and therefore was not guilty of deliberate homicide. The trial court instructed the jury that " '[t]he law presumes that a person intends the ordinary consequences of his voluntary acts.' " 442 U.S. at 515. Sandstrom objected and maintained that the instruction effectively shifted the burden of proof on the question of purpose or knowledge and required the defendant to disprove an element of the crime charged.

The *Sandstrom* Court stated the constitutional question:

The question presented is whether, in a case in which

intent is an element of the crime charged, the jury instruction, "the law presumes that a person intends the ordinary consequences of his voluntary acts," violates the Fourteenth Amendment's requirement that the State prove every element of a criminal offense beyond a reasonable doubt.

442 U.S. at 512. The Court answered the question in the affirmative, observing:

The threshold inquiry in ascertaining the constitutional analysis applicable to this kind of jury instruction is to determine the nature of the presumption it describes. See *Ulster County Court v. Allen*, [442 U.S. 140,] 157-163 [99 S. Ct. 2213, 60 L. Ed. 2d 777 (1979)]. That determination requires careful attention to the words actually spoken to the jury, see *ante*, at 157-159, n. 16, for whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction.

442 U.S. at 514.

The *Sandstrom* Court also noted:

Given the common definition of "presume" as "to suppose to be true without proof," Webster's New Collegiate Dictionary 911 (1974), and given the lack of qualifying instructions as to the legal effect of the presumption, we cannot discount the possibility that the jury may have interpreted the instruction in either of two more stringent ways.

First, a reasonable jury could well have interpreted the presumption as "conclusive," that is, not technically as a presumption at all, but rather as an irrebuttable direction by the court to find intent once convinced of the facts triggering the presumption. Alternatively, the jury may have interpreted the instruction as a direction to find intent upon proof of the defendant's voluntary actions (and their "ordinary" consequences), unless *the defendant* proved the contrary by some quantum of proof which may well have been considerably greater than "some" evidence—thus effectively shifting the burden of persuasion on the element of intent. Numerous federal

and state courts have warned that instructions of the type given here can be interpreted in just these ways.

(Emphasis in original.) 442 U.S. at 517. The Court further commented:

We do not reject the possibility that some jurors may have interpreted the challenged instruction as permissive, or, if mandatory, as requiring only that the defendant come forward with "some" evidence in rebuttal. However, the fact that a reasonable juror could have given the presumption conclusive or persuasion-shifting effect means that we cannot discount the possibility that Sandstrom's jurors actually did proceed upon one or the other of these latter interpretations. And that means that unless these kinds of presumptions are constitutional, the instruction cannot be adjudged valid.

442 U.S. at 519. Continuing, the *Sandstrom* Court stated:

Thus, the question before this Court is whether the challenged jury instruction had the effect of relieving the State of the burden of proof enunciated in *Winship* on the critical question of petitioner's state of mind. . . .

We consider first the validity of a conclusive presumption. This Court has considered such a presumption on at least two prior occasions. In *Morissette v. United States*, 342 U. S. 246 [72 S. Ct. 240, 96 L. Ed. 288] (1952), the defendant was charged with willful and knowing theft of Government property. Although his attorney argued that for his client to be found guilty, "the taking must have been with felonious intent," the trial judge ruled that "[t]hat is presumed by his own act." *Id.*, at 249. After first concluding that intent was in fact an element of the crime charged, and after declaring that "[w]here intent of the accused is an ingredient of the crime charged, its existence is . . . a jury issue," *Morissette* held:

"*It follows that the trial court may not withdraw or prejudge the issue by instruction that the law raises a presumption of intent from an act.* It often is tempting to cast in terms of a 'presumption' a conclusion which a court thinks probable from given facts. . . . [But] [w]e think presumptive intent has no place in this case. *A*

*conclusive presumption which testimony could not overthrow would effectively eliminate intent as an ingredient of the offense.* A presumption which would permit but not require the jury to assume intent from an isolated fact would prejudge a conclusion which the jury should reach of its own volition. A presumption which would permit the jury to make an assumption which all the evidence considered together does not logically establish would give to a proven fact an artificial and fictional effect. In either case, *this presumption would conflict with the overriding presumption of innocence with which the law endows the accused and which extends to every element of the crime." Id.,* at 274-275. (Emphasis added; footnote omitted.)

. . . [I]n *United States v. United States Gypsum Co.*, 438 U. S. 422 [98 S. Ct. 2864, 57 L. Ed. 2d 854] (1978), we reaffirmed the holding of *Morissette.* In that case defendants, who were charged with criminal violations of the Sherman Act, challenged the following jury instruction:

" 'The law presumes that a person intends the necessary and natural consequences of his acts. Therefore, if the effect of the exchanges of pricing information was to raise, fix, maintain, and stabilize prices, then the parties to them are presumed, as a matter of law, to have intended that result.' " 438 U. S., at 430. After again determining that the offense included the element of intent, we held: "[A] defendant's state of mind or *intent is an element of a criminal antitrust offense which . . . cannot be taken from the trier of fact through reliance on a legal presumption* of wrongful intent from proof of an effect on prices. Cf. *Morissette v. United States . . . .*

. . . .

"Although an effect on prices may well support an inference that the defendant had knowledge of the probability of such a consequence at the time he acted, the jury must remain free to consider additional evidence before accepting or rejecting the inference. . . . [U]ltimately the decision on the issue of intent must be left

to the trier of fact alone. The instruction given invaded this factfinding function." *Id.*, at 435, 446 (emphasis added). . . .

As in *Morissette* and *United States Gypsum Co.*, a conclusive presumption in this case would "conflict with the overriding presumption of innocence with which the law endows the accused and which extends to every element of the crime," and would "invade [the] factfinding function" which in a criminal case the law assigns solely to the jury. The instruction announced to David Sandstrom's jury may well have had exactly these consequences. Upon finding proof of one element of the crime (causing death), and of facts insufficient to establish the second (the voluntariness and "ordinary consequences" of defendant's action), Sandstrom's jurors could reasonably have concluded that they were directed to find against defendant on the element of intent. The State was thus not forced to prove "beyond a reasonable doubt . . . every fact necessary to constitute the crime . . . charged," 397 U. S., at 364, and defendant was deprived of his constitutional rights as explicated in *Winship*.

442 U.S. at 521-23.

In condemning the instruction in *Sandstrom v. Montana*, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979), the Court expressed the following:

A presumption which, although not conclusive, had the effect of shifting the burden of persuasion to the defendant, would have suffered from similar infirmities. If Sandstrom's jury interpreted the presumption in that manner, it could have concluded that upon proof by the State of the slaying, and of additional facts not themselves establishing the element of intent, the burden was shifted to the defendant to prove that he lacked the requisite mental state. Such a presumption was found constitutionally deficient in *Mullaney v. Wilbur*, 421 U. S. 684 [95 S. Ct. 1881, 44 L. Ed. 2d 508] (1975). In *Mullaney*, the charge was murder, which under Maine law required proof not only of intent but of malice. The trial court charged the jury that " 'malice aforethought is an

essential and indispensable element of the crime of murder.' " *Id.*, at 686. However, it also instructed that if the prosecution established that the homicide was both intentional and unlawful, malice aforethought was to be implied unless the defendant proved by a fair preponderance of the evidence that he acted in the heat of passion on sudden provocation. *Ibid.* As we recounted just two Terms ago in *Patterson v. New York*, "[t]his Court . . . unanimously agreed with the Court of Appeals that Wilbur's due process rights had been invaded by the presumption casting upon him the burden of proving by a preponderance of the evidence that he had acted in the heat of passion upon sudden provocation." 432 U. S., at 214. And *Patterson* reaffirmed that "a State must prove every ingredient of an offense beyond a reasonable doubt, and . . . may not shift the burden of proof to the defendant" by means of such a presumption. *Id.*, at 215.

Because David Sandstrom's jury may have interpreted the judge's instruction as constituting either a burden-shifting presumption like that in *Mullaney*, or a conclusive presumption like those in *Morissette* and *United States Gypsum Co.*, and because either interpretation would have deprived defendant of his right to the due process of law, we hold the instruction given in this case unconstitutional.

442 U.S. at 524.

Therefore, on account of the constitutionally impermissible instruction, the Supreme Court reversed Sandstrom's conviction and remanded the case for further proceedings.

Subsequently, in *Francis v. Franklin*, 471 U.S. 307, 105 S. Ct. 1965, 85 L. Ed. 2d 344 (1985), the Supreme Court reaffirmed the principles enunciated in *Sandstrom* and, concerning presumptions, whether mandatory, conclusive, or rebuttable, concluded that the due process requirement of the State's burden of proof beyond a reasonable doubt in criminal cases "prohibits the State from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime." 471 U.S. at 313. See, also, *Carella*

*v. California*, _____ U.S. _____, 109 S. Ct. 2419, 105 L. Ed. 2d 218 (1989).

If we were to approve an instruction framed in the literal language of § 28-1310(2), which informs a jury about the function of prima facie evidence or proof of intent, such an instruction, in the absence of a defendant's presentation of evidence negativing intent established by the "prima facie evidence," would have the legal effect of a directed verdict on the issue of criminal intent as an element of the offense prohibited by § 28-1310: "[V]erdicts may not be directed against defendants in criminal cases. *United States v. Martin Linen Supply Co.*, 430 U. S. 564, 572-573 [97 S. Ct. 1349, 51 L. Ed. 2d 642] (1977); *Carpenters v. United States*, 330 U. S. 395, 408 [67 S. Ct. 775, 91 L. Ed. 973] (1947) . . . ." *Sandstrom v. Montana, supra* at 516 n.5.

In accordance with *Sandstrom*, we conclude that a jury instruction founded on the presumption created by § 28-1310(2) is constitutionally impermissible because such an instruction deprives a defendant of the due process right that the State must prove beyond a reasonable doubt each element of the crime charged, and shifts the burden to the defendant to disprove the element of intent in the offense charged.

Since the jury instruction given in this case informed the jury that based on § 28-1310(2), Kipf's criminal intent had been established, the instruction is erroneous and prejudicial because it deprived Kipf of his substantial right to a trial by jury on the issue of criminal intent necessary for the crime charged under § 28-1310. Such prejudicial error requires reversal of Kipf's conviction.

However, the reversal required in this appeal does not mean that upon retrial the element of Kipf's criminal intent may not be proved by appropriate circumstantial evidence or direct evidence, if any. See *State v. Pierce*, 231 Neb. 966, 971, 439 N.W.2d 435, 440 (1989): "The intent involved in conduct is a mental process and may be inferred from the conduct itself, the actor's language in reference to the conduct, and the circumstances surrounding an incident." See, also, *State v. Swigart*, 233 Neb. 517, 446 N.W.2d 216 (1989).

## 2. Jury Notes

Because the issue is likely to arise at the new trial, we address Kipf's concern with the practice of permitting jurors to take notes.

In *Omaha Fire Ins. Co. v. Crighton,* 50 Neb. 314, 69 N.W. 766 (1897), this court, without laying down any rule, implicitly adopted a commissioner's recommendation that it not be said that the trial court abused its discretion in permitting jurors, at the request of Crighton's counsel, to take notes during testimony relating to the numerous items claimed to have been destroyed by fire.

Five years later, in *Swift & Co. v. Bleise,* 63 Neb. 739, 89 N.W. 310 (1902), this court explicitly adopted a commissioner's recommendation that the taking of notes by two jurors not be considered misconduct in and of itself, particularly in view of the fact that any error was waived by the defendant's failure to object.

This court next faced the issue 73 years later in *Bakhit v. Thomsen,* 193 Neb. 133, 225 N.W.2d 860 (1975). The defendant therein complained that the taking of notes by some jurors during the reading of a deposition into evidence and carrying those notes into their deliberations constituted error. We noted that

> the taking of notes of the testimony of a witness by jurors has never been prohibited in this state, although it has been held that such practice was frowned upon and *may* constitute prejudicial error. . . . The validity of an objection to the taking of such notes by jurors would seem to be based upon the subsequent use of such notes.

(Emphasis in original.) *Id.* at 145, 225 N.W.2d at 867-68. The court concluded:

> In this case the defendant's counsel had almost 3 weeks before argument for new trial to obtain evidence regarding the use of such notes after the jury returned to the jury room, but there is no showing in the record that the notes were used, and no showing of prejudice to the defendant.

*Id.* at 145, 225 N.W.2d at 868.

A year later, in *Ward v. Nebraska Electric G. & T. Coop.,*

*Inc.*, 195 Neb. 641, 240 N.W.2d 18 (1976), a condemnation proceeding, the trial court noticed one of the jurors taking notes, instructed him that such was not permitted, and confiscated them. In answer to the appellant's claim that the lower court erred in not granting a new trial on the basis of the improper note-taking, we again noted that juror note-taking was not prohibited, but that it was frowned upon and might, in some cases, constitute prejudicial error. We held, however, that appellant had failed to show such error.

To this point then, we have discouraged note-taking by jurors but have required a party seeking relief because of such practice to show prejudice, and have said that the existence of prejudice depends upon the use made of the notes.

Over the years, there has developed a respectable body of thought that jurors ought to be permitted to take notes at the discretion of the trial judge and under appropriate controls. ABA Standards for Criminal Justice § 15-3.2 (2d ed. Supp. 1986); Unif. R. of Crim. P. § 513(e), 10 U.L.A. 129 (Sp. Pamph. 1987); Urbom, *Toward Better Treatment of Jurors by Judges*, 61 Neb. L. Rev. 409 (1982). Typical of the courts adopting that view is that in *Travis v. Commonwealth*, 457 S.W.2d 481 (Ky. 1970), which concluded that if not attended with undue consumption of time, jurors should be encouraged to take notes as an aid to memory. The court observed that the better educational backgrounds jurors now possess make earlier concerns with the practice irrelevant. See, also, *Goodloe v. United States*, 188 F.2d 621 (D.C. Cir. 1950), *cert. denied* 342 U.S. 819, 72 S. Ct. 35, 96 L. Ed. 619 (1951); *Watkins v. State*, 216 Tenn. 545, 393 S.W.2d 141 (1965).

Courts which forbid the practice do so on the grounds that a note-taking juror may emphasize to himself or herself and perhaps other jurors some aspects of the case and neglect other aspects, that an unskilled note-taker is likely to miss what is said, and that a note-taking juror is apt to divert the attention of other jurors and be perceived as being more alert than non-note-takers and thus regarded as more informed than others. *Thornton, Admrx. v. Weaber, Admr., Aplnt.*, 380 Pa. 590, 112 A.2d 344 (1955). See, also, *State v. Jones*, 222 Kan. 56, 563 P.2d 1021 (1977); *State v. Groves*, 311 So. 2d 230 (La.

1975), *overruled on other grounds, State v. Lee*, 331 So. 2d 455 (La. 1976).

It is true, of course, that trial attorneys and judges routinely take notes as aids to memory; but lay jurors lack the legal training which enables attorneys and judges to distinguish between the legally relevant and irrelevant, and many jurors lack the note-taking skills which develop with practice. Moreover, trial attorneys and judges have a greater degree of control over the speed with which the adduction of evidence proceeds than an individual juror would ordinarily possess and thus are less likely to be distracted by the note-taking process than are jurors.

We are not persuaded that juror note-taking is such an aid to the search for truth that a party ought to be compelled to submit to the practice. Neither can there be two trial records. We therefore rule that henceforth, jurors shall be permitted to take notes if, and only if, the parties agree, outside the jury's presence, (1) that jurors may, but need not, take notes and (2) that such notes as are taken may be used during the jury's deliberations but not preserved for review on appeal; rather, the notes shall be treated as confidential between the juror making them and the other jurors. In the event the parties so agree, the trial judge shall ensure the confidentiality of the notes during the course of trial and the jury's deliberations, and shall cause the notes to be destroyed immediately upon return of the verdict.

REVERSED AND REMANDED FOR A NEW TRIAL.

HASTINGS, C.J., concurring.

I concur in the result reached by the majority, but do not embrace all of the concepts and theories discussed in that opinion, particularly with reference to presumptions as applied to the statute in this case.

The section of the statute under attack does not create a true presumption. It merely establishes a prima facie case; i.e., if the evidence discloses that the caller used indecent, lewd, or obscene language or made a lewd suggestion, the fact finder may, but is not required to, infer an intent to terrify, intimidate, threaten, harass, annoy, or offend. *State v. Bird Head*, 181 Neb. 885, 151 N.W.2d 615 (1967).

"The statutory provision does not affect the risk of nonpersuasion. If specific instructions on the inference are given, they ought to dispel any notion that proof of the basic fact shifts the burden of persuasion to defendant. A jury may, but is not required to, infer guilt from existence of the basic fact."

*Id.* at 886-87, 151 N.W.2d at 616.

I do agree that the trial court erred in instructing the jury as to prima facie evidence. This is especially true when it is apparent that the jury was not instructed as to the definition of "prima facie" and when the jury was not given an instruction on criminal intent.

In any event, the language of a statutory provision such as is found in Neb. Rev. Stat. § 28-1310(2) (Reissue 1985) is for the guidance of the trial judge. "The concept of 'prima facie evidence' is usually one for the trial judge to use in determining if there is sufficient evidence to send the case to the jury." *State v. Stalder*, 231 Neb. 896, 906, 438 N.W.2d 498, 505 (1989). The language of the statute in this case should have been reserved for that purpose and should not have been included within the instructions.

BOSLAUGH, J., joins in this concurrence.