STATE OF NEBRASKA, APPELLEE, V. DAVID SWIGART, APPELLANT.

446 N.W.2d 216

Filed September 29, 1989.   No. 88-448.

Robert M. Spire, Attorney General, and Yvonne E. Gates for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, and GRANT, JJ.

SHANAHAN, J.

A jury in the district court for Lancaster County convicted David Swigart of first degree assault, which is defined by Neb. Rev. Stat. § 28-308(1) (Reissue 1985): "A person commits the

offense of assault in the first degree if he [or she] intentionally or knowingly causes serious bodily injury to another person." Neb. Rev. Stat. § 28-109(20) (Reissue 1985) provides: "Serious bodily injury shall mean bodily injury which involves a substantial risk of death, or which involves substantial risk of serious permanent disfigurement, or protracted loss or impairment of the function of any part or organ of the body."

## STANDARD OF REVIEW

In determining whether evidence is sufficient to sustain a conviction in a jury trial, the Supreme Court does not resolve conflicts of evidence, pass on credibility of witnesses, evaluate explanations, or reweigh evidence presented to a jury, which are within a jury's province for disposition. A verdict in a criminal case must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support that verdict.

*State v. Brown*, 225 Neb. 418, 428, 405 N.W.2d 600, 606 (1987); *State v. Willett, ante* p. 243, 444 N.W.2d 672 (1989).

On a claim of insufficiency of evidence, the Supreme Court will not set aside a guilty verdict in a criminal case where such verdict is supported by relevant evidence. Only where evidence lacks sufficient probative force as a matter of law may the Supreme Court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt.

*State v. Robertson*, 223 Neb. 825, 830, 394 N.W.2d 635, 638 (1986). See, also, *State v. Willett, supra*.

In the late evening of August 26, 1987, the female victim, who was 19 years old, was visiting at a Lincoln motel with an acquaintance, Sean Thompson, and David Swigart, age 23, a former boyfriend with whom the victim had been intimately involved in the spring of 1987. In the course of the visit, the victim imbibed a "mixed drink" of "gin and pop" and a "wine cooler"; Thompson drank straight gin; and Swigart had wine coolers. When Thompson became intoxicated, Swigart offered to walk the victim to her home, which was about nine blocks from the motel.

As Swigart and the victim walked, they discussed "the weirdest place . . . the most different, weirdest place we'd both

had sex." En route to the victim's home, the couple approached a van parked on the street and entered the parked vehicle, where they engaged in sexual relations. Having concluded that activity, the couple resumed their walking, which took them to the apartment of Swigart's sister. When they arrived at the apartment, Swigart told the victim that he no longer wished to walk the victim to her home. This upset the victim, who slapped Swigart's face. Swigart, more surprised than hurt by the slap, put his arms around the victim's waist, raised her from the ground, and "[t]hrew her to the ground," causing the victim to "kind of hit on her side" on the concrete surface. As the victim lay on the concrete, Swigart kicked the victim's stomach and then said, "I'm sorry." While the victim was still on the ground, Swigart kicked at the victim, lacerating her nose, and then kicked again, striking near the victim's spine and ribs. At this point, with his closed fist, Swigart delivered a blow to the defenseless victim's face. When the turmoil ended, Swigart went inside his sister's apartment, and the victim returned to Thompson's motel for help. Thompson and his roommate assisted the blood-covered victim, whom Thompson described as "bleeding" with "[t]wo black eyes." After the victim returned to her home, police were summoned and took the victim to the emergency room of a hospital. The victim had a bright crimson crescent-shaped mark, clinically described as "periorbital" bruising, around each eye and displayed lacerations on her nose as well as bruises inside her mouth.

Officers of the Lincoln Police Department went to the apartment of Swigart's sister, who admitted the officers into the apartment. After entering the apartment, the officers opened the bathroom door and found Swigart "holding a tub of potato salad." The officers arrested Swigart and, while transporting him to police headquarters, administered the *Miranda* admonition to Swigart. During interrogation, Swigart admitted that he had "body slammed" the victim to the ground, but asserted, "I didn't really intend to hurt her." Swigart stated that after he had thrown the victim to the concrete surface, "I apologized to her."

When called as a witness for the State, the physician who had attended the victim at the hospital emergency room testified that the physician's specialty was "emergency

medicine," a medical specialty which "basically deals with emergent care in an emergency room, [dealing] with all sorts of life-threatening emergencies and other related emergent care." According to the physician, the victim had sustained "obvious facial trauma . . . a lot of bruising about the face and her nose; she had severe trauma to her nose. It was very widened. It was seriously injured." The victim sustained a "nasal tip fracture of her nose," an injury which was disclosed by x ray and physical examination and was the type of extensive injury which caused one to "cough up blood from swallowing blood." Regarding the kick to the victim's face, the physician stated: "Any time [there is] that kind of an impact to the face and the cranial vault . . . that could be very life threatening. Also to the neck. A lot of people who have severe injuries to the face can also have significant neck trauma and fractures." In reference to a kick in the victim's back, the physician also testified: "That could also be a very serious, possibly life-threatening injury. It could cause damage to the kidneys, spleen. There are all sorts of abdominal organs." A kick to the stomach was also "potentially life-threatening" on account of possible injury to the spleen and liver. When asked whether the injury to the victim's nose would alter a person's appearance, without specialized "follow-up" treatment, the physician responded, "Absolutely."

At trial, testifying on his own behalf, Swigart denied that he had kicked the victim or struck her with his fist. Also, Swigart testified that he did not intend to cause serious bodily injury to the victim.

## CLAIM OF INSUFFICIENT EVIDENCE

Swigart contends that there is insufficient evidence to support the verdict of guilty on the charge of first degree assault. Specifically, Swigart maintains that under Nebraska's first degree assault statute, the defendant must intentionally or knowingly cause serious bodily injury and that the victim must in fact suffer serious bodily injury.

Concerning an intent to cause serious bodily injury for a first degree assault, we stated in *State v. Ristau*, 201 Neb. 784, 787, 272 N.W.2d 274, 276 (1978): "To constitute the offense of assault with intent to do great bodily injury there must be an unlawful assault, coupled with a present ability and intent to

injure, but no actual battery need occur." We also stated in *Ristau, supra* at 786-87, 272 N.W.2d at 276:

> The record establishes that the defendant not only threw the victim to the pavement but admitted that he intended to use whatever force was necessary to take her purse. The intent with which an act is done is rarely, if ever, susceptible of proof by direct evidence, but may be inferred or gathered from outward manifestations, words, or acts, and the facts or circumstances surrounding or attendant upon the assault. It is not essential to a conviction for assault with intent to do great bodily injury that the accused should have intended the precise injury which followed as a result of the assault. It is sufficient if serious bodily harm of any kind was contemplated.

See, also, *State v. Tweedy*, 224 Neb. 715, 400 N.W.2d 865 (1987); *State v. Thielen*, 216 Neb. 119, 342 N.W.2d 186 (1983).

"The intent involved in conduct is a mental process and may be inferred from the conduct itself, the actor's language in reference to the conduct, and the circumstances surrounding an incident." *State v. Pierce*, 231 Neb. 966, 971, 439 N.W.2d 435, 440 (1989).

"When an element of a crime involves existence of a defendant's mental process or other state of mind of an accused, such elements involve a question of fact and may be proved by circumstantial evidence." *State v. Hoffman*, 227 Neb. 131, 140, 416 N.W.2d 231, 237 (1987). See, also, *State v. Blue Bird*, 232 Neb. 336, 440 N.W.2d 474 (1989).

Swigart's conduct toward the victim spoke so loudly that the jury apparently did not hear Swigart's self-serving disclaimer of intent. Although Swigart testified that he did not intend to cause serious bodily injury to the victim, the evidence presented to the jury supplied a sufficient basis for the reasonable inference that Swigart intended to inflict serious bodily injury on the victim.

Swigart also argues that to support a conviction of first degree assault, the victim must have actually sustained serious bodily injury, or as Swigart suggests: "The other element on which there was insufficient evidence to sustain a conviction for first degree assault is whether [the victim] did in fact suffer

serious bodily injury." Brief for appellant at 7. In § 28-109(20), which defines "serious bodily injury" in relation to the criminal offense of assault in the first degree, a significant phrase is "bodily injury which involves a substantial risk" of death, serious permanent disfigurement, or diminution of bodily function, that is, protracted loss or impairment sustained by any part of the human body. The word "risk" means "CONTINGENCY, DANGER, PERIL, THREAT . . . someone or something that creates or suggests a hazard or adverse chance: a dangerous element or factor . . . ." Webster's Third New International Dictionary, Unabridged 1961 (1981). As a synonym for risk, the word "danger" means "the state of being exposed to harm: liability to injury, pain, or loss: PERIL, RISK . . . ." *Id.* at 573. Thus, in reference to first degree assault, assaultive conduct which results in exposure to the specific harms described in § 28-109(20), and not actual infliction of the harms described in the statute, is the gravamen of first degree assault and the criminal conduct proscribed by § 28-308(1). Consequently, in *State v. Pribil*, 224 Neb. 28, 30-31, 395 N.W.2d 543, 546 (1986), which involved a conviction for attempted first degree assault, we stated: "Contrary to defendant's argument, it is not necessary that the injury *caused* death, or serious permanent disfigurement or impairment of the function of any part or organ of the body, but only that it *involved a substantial risk* of producing those results." (Emphasis in original.)

At Swigart's trial, the physician testified that a kick to a person's head "could be very life threatening" and that a kick to the back "could also be a very serious, possibly life-threatening injury." The physician's testimony very clearly substantiated and underscored a fact generally known in human experience. The degree or extent of exposure to the harms specified in § 28-109(20), that is, whether such exposure to harm was "substantial," was a submissible jury question under the circumstances.

The evidence supports the verdict. For that reason, we affirm Swigart's conviction.

AFFIRMED.