STATE OF NEBRASKA, APPELLEE, V. WILLIAM L. PARKS, APPELLANT.
565 N.W.2d 734

Filed June 17, 1997.    No. A-96-1012.

Julie E. Bear, of Reinsch & Slattery, P.C., for appellant.

Don Stenberg, Attorney General, and Mark D. Starr for appellee.

IRWIN, SIEVERS, and MUES, Judges.

SIEVERS, Judge.
William L. Parks was charged with intentionally abusing his son in violation of Neb. Rev. Stat. § 28-707 (Reissue 1995). During the trial, Parks' trial counsel requested that the jury be given an instruction to allow it to consider the lesser charge of negligent child abuse. The trial court denied the request, and the jury found Parks guilty of intentional child abuse. He was sentenced to 18 to 36 months' imprisonment. Parks now appeals.

## FACTUAL BACKGROUND
On April 13, 1996, Parks and Grace Madsen took their then 6-month-old son to the University of Nebraska Medical Center

to be examined. Doctors at the medical center examined the baby and found that his right thigh bone, or femur, had a "spiral fracture." The doctors also observed a bruise on the baby's right eye, and x rays revealed a fracture of the left tibia, or shin bone, which had nearly healed.

The police were notified, and Officer Steve Miller of the Bellevue Police Department proceeded to the hospital and began conducting an investigation. As a result of his investigation, Parks was arrested and charged with intentional child abuse under § 28-707(1).

At trial, several doctors who had treated the baby on April 13 were called to testify. The first was Dr. Robert Kahnk, a family practice physician. Dr. Kahnk testified that a "spiral fracture" is caused by a twisting motion, and in order to break the femur, the strongest bone in the body, a force at least equal to falling off of a changing table would be necessary. He then stated that a 6-month-old baby, without having bone defects or pathology in the bone, neither of which were present in the baby, would not be able to twist enough on his own to cause a spiral fracture of the femur.

Dr. Jeffrey Zacharias, a third-year orthopedic surgery resident, also testified. He stated that Madsen had told him that the baby's leg had gotten caught in the crib the night before (April 12) and that on the 13th, the baby was not moving his leg so they brought him in to be checked out. Dr. Zacharias testified that the spiral fracture was suspicious to him because so much force is needed to cause this type of fracture that it is unlikely a 6-month-old child could cause it on his own. Dr. Zacharias then opined that this type of injury would be inconsistent with a baby having gotten his leg caught in the crib.

Next, Officer Miller testified that during his investigation, Parks had

> [i]ndicated to me at first that he didn't know how the injury occurred and he stated the injury had occurred because he had turned the baby [at a] ninety degree angle or ninety degrees in an effort to change the baby's diaper. Then he told me he actually turned the baby this ninety degrees while holding the baby's right leg with his hand, actually turned the baby over at the same time with a rapid motion.

Officer Miller also stated that Parks told him he heard a snapping noise as he turned the baby. Officer Miller then stated that Parks had told him that the baby had been crying for quite some time, that Parks was angry, that he has a problem controlling his anger, and that he did not intend to hurt the baby. Officer Miller testified that he had Parks use a stuffed animal to demonstrate how he had flipped the baby over. According to Officer Miller's account of the demonstration, the baby was lying on his stomach, with his head to Parks' left and his feet to Parks' right as Parks entered the room. Parks then grabbed the baby's right leg with his right hand, rapidly pulling the baby up, flipping him over, and rotating him 90 degrees all in one motion.

After Officer Miller's testimony, the State rested its case and the defense called its only witness, Parks. Parks testified that Officer Miller used the stuffed animal to show Parks how Officer Miller believed the baby had been flipped over and that Parks had only said "it could have" happened that way because he did not have an attorney present. Parks also testified that he was angry because of a fight he had with Madsen, not because of the baby's crying. Parks then testified that he went into the baby's room three times on the night of April 12. Parks said that the first time he went in was to change the baby's diaper. He stated the baby was not crying at this time. The second time he went into the room was because the baby was crying. Parks picked up the baby and then noticed that the baby's leg was caught in the crib. Parks said that he did not think he had hurt the baby while picking him up. He went in a third time to turn the baby over. The baby was crying as he went in. Parks said that as he turned the baby, using both hands, he "felt" what he described as a creaking or popping noise. Parks then stated that he did not tell anyone about the leg being caught in the crib bars until after he had talked to his lawyer. The State recalled Officer Miller in rebuttal, who testified that Parks had said that he was mad at the baby rather than saying that he was mad at Madsen.

At the close of the evidence, a jury instruction conference was held. Trial counsel for Parks requested that the jury be instructed on negligent child abuse. The trial court denied the request, and the jury was instructed only on intentional child abuse. Parks was found guilty of intentional child abuse, a Class IV felony, and sentenced to 18 to 36 months' imprisonment.

## ASSIGNMENTS OF ERROR

Parks' assignments of error are as follows: (1) The court erred in refusing and failing to instruct the jury on the lesser-included offense of negligent child abuse, (2) the evidence is insufficient as a matter of law to support the jury's verdict of guilty of intentional child abuse, and (3) the trial court erred in imposing an excessive sentence.

## STANDARD OF REVIEW

■ On questions of law, an appellate court reaches a conclusion independent of the trial court. *Smith v. Smith*, 246 Neb. 193, 517 N.W.2d 394 (1994).

■ Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Cody*, 248 Neb. 683, 539 N.W.2d 18 (1995).

## ANALYSIS

*Jury Instruction.*

Parks' first assignment of error stems from the trial court's refusal to instruct the jury on the possibility of finding Parks guilty of negligent child abuse under § 28-707(3). Section 28-707 reads, in pertinent part:

(1) A person commits child abuse if he or she *knowingly, intentionally, or negligently* causes or permits a minor child to be:

(a) Placed in a situation that endangers his or her life or health; or

(b) Cruelly confined or cruelly punished; or

(c) Deprived of necessary food, clothing, shelter, or care.

. . . .

(3) Child abuse is a Class I misdemeanor if the offense is committed negligently.

(4) Child abuse is a Class IV felony if the offense is committed knowingly and intentionally and does not result in serious bodily injury as defined in section 28-109.

(5) Child abuse is a Class III felony if the offense is committed knowingly and intentionally and results in serious bodily injury as defined in such section.

(Emphasis supplied.)

Despite an injury which caused the baby to be in a half-body cast, the State charged Parks with the Class IV felony rather than the more serious Class III felony which is applicable in the event of serious bodily injury. See Neb. Rev. Stat. § 28-109(20) (Reissue 1995) ("[s]erious bodily injury shall mean . . . protracted loss or impairment of the function of any part or organ of the body").

It is the duty of the trial judge to instruct the jury on the pertinent law of the case, whether requested to do so or not, and an instruction or instructions which by the omission of certain elements have the effect of withdrawing from the jury an essential issue or element in the case are prejudicially erroneous. *State v. Williams*, 247 Neb. 931, 531 N.W.2d 222 (1995). A court must instruct on a lesser-included offense if (1) the elements of the lesser offense for which an instruction is requested are such that one cannot commit the greater offense without simultaneously committing the lesser offense and (2) the evidence produces a rational basis for acquitting the defendant of the greater offense and convicting the defendant of the lesser offense. *State v. Huebner*, 245 Neb. 341, 513 N.W.2d. 284 (1994).

Parks' counsel requested that the trial court instruct the jury on negligent child abuse, but the court refused the request.

This court has previously held that negligent child abuse is a lesser-included offense of intentional child abuse. *State v. Fitzgerald*, 1 Neb. App. 315, 493 N.W.2d 357 (1992). It seems axiomatic that one who intentionally punishes a child, for example by burning with a cigarette, also is negligent, since his or her conduct obviously fails to meet the standard of how a reasonably prudent person would treat or discipline a child.

We assume that the trial court rejected the request for submission of negligent child abuse on the grounds that there was not a rational basis in the evidence for submission of negligent child abuse to the jury. The question is whether there was a rational basis in the evidence for Parks to be acquitted of intentional child abuse, but convicted of negligent child abuse. It is this determinative question to which we now turn.

■ We first look to the meanings of "intentionally" and "negligently" as used in § 28-707. "Negligence" is doing something, or failing to do something, which an ordinarily prudent person would do, or not do, under the circumstances. *Sacco v. Gau*, 188 Neb. 808, 199 N.W.2d 605 (1972). Negligence must be measured against a particular set of circumstances present in each case. *Krehnke v. Farmers Union Co-Op. Assn.*, 199 Neb. 632, 260 N.W.2d 601 (1977).

■ In contrast to negligence, "intentionally" has been defined as willfully or purposefully, and not accidentally or involuntarily. *State v. Schott*, 222 Neb. 456, 384 N.W.2d 620 (1986) (defendant charged with cruelty to animals under statute prohibiting intentional or reckless "cruel mistreatment" or "cruel neglect," Neb. Rev. Stat. § 28-1002 (Reissue 1979)). The intent involved in conduct is a mental process and may be inferred from the conduct itself, the actor's language in reference to the conduct, and the circumstances surrounding the incident. *Id.*

■ This causes us to digress to the question of what has to be done intentionally under the child abuse statute, § 28-707: Must the act be done intentionally which causes the injury, or, must the actor actually intend the injury which results? This issue is often cast in the terminology of "specific intent" versus "general intent," which the Nebraska Supreme Court has discussed extensively in *State v. Williams*, 243 Neb. 959, 503 N.W.2d 561 (1993). *Williams* deals with the precise nature of the intent required in first degree assault cases. In its discussion, the court held that first, second, and third degree assault are all general intent crimes, meaning that the actor need only intend the assault, not the injury which results. In *State v. Swigart*, 233 Neb. 517, 446 N.W.2d 216 (1989), an appeal of the defendant's first degree assault conviction, the court rejected the defend-

ant's claim that the evidence was insufficient to sustain the conviction because the defendant said he did not intend to cause serious bodily injury. Similarly, Parks claims that he did not intend to hurt the baby or break his leg. The *Williams* court said that the assault statutes prohibit conduct consisting of acts which cause injury of various seriousness. See, also, *State v. Duis*, 207 Neb. 851, 301 N.W.2d 587 (1981) (holding that assault with dangerous weapon is general intent crime and that it is only necessary to prove that defendant did act of injuring another with dangerous instrument in intentional manner). The assault statutes, Neb. Rev. Stat. §§ 28-308 through 28-310 (Reissue 1995), address various gradations of crimes, ranging from Class III felony (§ 28-308) to Class II misdemeanor (see § 28-310) depending upon the seriousness of the injury and the level of violation involved in the act. But assaults of all degrees are general intent crimes according to *Williams, supra.*

Every crime is constituted by the coupling of either specific intent or general intent and an act. Where the offense is one in which a general criminal intent suffices, a general intention is inferred from the act and determined by the finder of fact. Other offenses require a specific intent, meaning the act must be coupled with the intent to bring about the prohibited result. Nebraska utilizes the presumption that a person intends the natural and probable consequences of his or her unlawful voluntary act. See *State v. Hoffman*, 227 Neb. 131, 416 N.W.2d 231 (1987). However, a specific intent cannot be presumed from an unlawful act which does not naturally bespeak that intent. 21 Am. Jur. 2d *Criminal Law*, §§ 129 and 130 (1981).

*Hoffman* involved a conviction for second degree assault, a Class IV felony, under § 28-309(1)(b) (recklessly causing serious bodily injury to another with dangerous instrument). Hoffman argued that he was so drunk (blood alcohol content of 0.39) that he could not "intentionally" cause the death of the victim, whose vehicle he unintentionally smashed into. The court first pointed out that the charge against Hoffman was "recklessly causing," not "intentionally causing," and then held that under § 28-309(1)(b) the intent to inflict or cause serious bodily harm is not an element of the crime, but, rather, the reckless act or conduct which caused the serious bodily injury is the

gravamen of the crime. The *Hoffman* court said that a reckless act involves a conscious choice and a course of action made with knowledge of a serious danger or risk to another as a result of such choice of action or with knowledge of the attendant circumstances which, to a reasonable person, would indicate or disclose a serious danger or risk to another as a result of the course of action selected. *Id.* In reaching its holding, the *Hoffman* court held that where one deliberately does an act (driving with a blood alcohol content of 0.39) which proximately causes and directly produces a result (serious bodily injury with dangerous instrument) which the criminal law is designed to prevent, the actor is legally and criminally responsible for all the natural and necessary consequences of the unlawful act, although a particular result of the act was not intended or desired. To summarize, choosing to drive when one is as drunk as Hoffman was is a choice posing obvious danger to others, and when Hoffman embarked on that course of action he was criminally responsible for the results, even though he did not set out to kill anyone in general or the victim in particular.

▮ Neither the Supreme Court nor this court has addressed whether the child abuse statute, § 28-707, proscribes specific intent or general intent crimes. We believe that the language of the statute, as well as the foregoing principles from the cases involving the assault statutes, indicates that the child abuse statute, § 28-707, is a general intent statute, and we so hold. As a result, the State need not prove that Parks intended, by his action, to cause the baby to suffer a fractured leg. Instead, § 28-707 is a general intent statute, meaning that the crime of child abuse is committed if a child (1) is placed in a situation that endangers his or her life or health, (2) is cruelly confined or cruelly punished, or (3) is deprived of necessary food, clothing, shelter, or care. It is these three acts which the statute criminalizes, and as general intent crimes, the actor need do only one of the three prohibited acts or omissions to be criminally liable. The extent of that liability, whether misdemeanor or felony, and the class of felony are determined by the seriousness of the injury and by the degree of violation involved—knowingly and intentionally versus merely negligently.

Child abuse is a Class I misdemeanor if committed negligently, irrespective of whether injury results and irrespective of

how serious any injury might be. See § 28-707(3). Child abuse is a Class IV felony if committed intentionally but serious bodily injury does not result; it is a Class III felony if committed intentionally and serious bodily injury results; and finally, child abuse is a Class IB felony if committed intentionally and a child's death results. See § 28-707(4) through (6).

In Parks' trial, jury instruction No. 3 is the instruction at issue, and it provided: "Regarding the charge of intentional child abuse, the elements of the State's case are: (1) That the defendant abused [the baby] by cruelly punishing him; (2) That the act or acts of the defendant were done intentionally or knowingly . . . ." Thus, the court submitted only the matter of cruel punishment, see § 28-707(1)(b), explicitly excluding from the jury's consideration the element of placement of the baby in a situation endangering his life or health, see § 28-707(1)(a), and in this regard we note that the information charged both acts on an alternative basis. The court's instruction also excluded the question of whether the offense was committed negligently.

We have previously said that negligent child abuse is a lesser-included offense of intentional child abuse, and we now return to whether there was a rational basis in the evidence to acquit Parks of the greater charge, intentional child abuse, while convicting him of the lesser charge, negligent child abuse. This is the second prong of the test to determine whether the lesser-included instruction must have been given. The focus of the argument offered by Parks on appeal is that he did not intend to hurt the baby and that the "injuries were sustained in handling the child inappropriately during the process of changing the child's diaper." Brief for appellant at 11. To answer the rational basis question, we return to the evidence.

The only evidence in the record to support the notion that the baby's injury was from negligence is Parks' testimony that he picked the crying baby up from the crib when his leg was caught in the bars of the crib. Parks did not testify that in doing so he handled the baby in an unusual, awkward, or extraordinarily forceful manner. He testified that he was not angry at the baby, but, rather, he was angry at Madsen, with whom he had been fighting, and that he did nothing to injure the baby and did not intend to injure the baby. Thus, if this were the end of the

inquiry, there appears to be sufficient evidence, which, if believed despite what Parks initially told the investigating officer, would support acquittal of the greater offense and conviction of the lesser. However, the inquiry into the evidence must go further and include examination of the medical evidence.

The undisputed medical evidence is that the femur, even in a child, is one of the strongest bones of the body and that it takes a great force to break it—as much or greater force than being dropped from a parent's arms or a changing table. Yet, it is important to remember that the mechanics of the necessary force, a twisting or torquing, are markedly different than if an infant were dropped, even if from a great height. This is a spiral fracture. The testimony of Dr. Zacharias, the orthopedic resident who examined the child, describes the injury as "[l]ike a barber pole, how you see the stripes. If there was a twisting, that's the type of fracture that could occur as opposed to if you snap a twig in half it would be a straight fracture." All three physicians who testified agreed that a spiral fracture of the femur is "suspicious for child abuse" because it is an injury to one of the strongest bones of the body and it requires great force in a twisting motion. All medical evidence was that the injury was not consistent with the baby's having his leg caught in the crib and was not consistent with the baby's inflicting it on himself, due to the force required.

Parks offers up a potential explanation for how the injury could have been inflicted: "I went to pick him up not knowing his leg was caught in the crib." This testimony was elicited on cross-examination. In Parks' direct testimony, he simply said that he did nothing to intentionally injure his son. Parks' cross-examination testimony was that he had already turned the baby when he found the baby's leg caught in the crib, but he did not know if it hurt the baby or not. Parks also testified that when he later turned the baby over, he "felt a popping noise." We emphasize that Parks' testimony about what he did or did not do with the baby is extremely nebulous, and in our analysis we have endeavored to place an understandable construction on his confusing and uncertain testimony. However, it is crystal clear that Parks offered no medical evidence, either from a witness of his own or by cross-examination of the prosecution's medical wit-

nesses, that this spiral fracture could have been inflicted merely by picking up the baby, in a normal manner, even if his leg were caught in the crib when turned, as Parks said he did. Without such testimony, the jury is left to speculate on the causation of the injury.

In short, without some medical evidence that the injury could have happened accidentally during Parks' handling of the baby, as he described it, there is no rational basis for a finding that Parks did not intentionally cruelly punish the baby, but, rather, that the injury was inflicted negligently. The need for supporting medical evidence flows from the well-established rule that when injuries are not objective, expert medical testimony is required to establish the cause and extent of the injuries. *Storjohn v. Fay*, 246 Neb. 454, 519 N.W.2d 521 (1994). The cause and mechanics of this injury are not objective, thus expert testimony about its cause is needed. The undisputed medical evidence can be accurately summarized: A spiral fracture of a child's femur is antithetic to the normal careful handling that a 6-month-old baby requires. Thus, it fell to Parks to support his "negligent causation" defense with medical evidence, which he did not do. As a consequence, there was no rational basis to acquit Parks of the crime of intentional child abuse by cruelly punishing the baby and to convict Parks of mere negligent child abuse. Therefore, the trial court correctly refused the request to give the lesser-included offense instruction on negligent child abuse.

*Sufficiency of Evidence.*

Parks argues that the evidence is insufficient to sustain his conviction. In reviewing a criminal conviction to determine if the evidence is sufficient to support a conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Cody*, 248 Neb. 683, 539 N.W.2d 18 (1995).

The evidence in the case, viewed and construed most favorably to the State, does support the conviction for intentional

child abuse. First, the State presented evidence that Parks, at a time when he was angry at the baby because of his crying, cruelly punished the baby by jerking him up by the leg and violently twisting him over. Such evidence obviously satisfies the "cruelly punished" element of § 28-707. The second element that must be shown is "causation." Section 28-707 requires that the person convicted "cause" or "permit" the child to be cruelly punished. Again, the State presented evidence that Parks violently and forcefully flipped and twisted the baby's body by one leg. There was evidence that Parks heard a popping noise as he flipped the baby over. From this evidence, and the medical evidence about how a spiral fracture is caused, the jury could reasonably conclude that Parks had caused the baby's injury while punishing him for incessantly crying. The only other element of § 28-707 that need be met is the element of intent. In order to sustain a conviction of intentional child abuse, the State must prove that Parks "intentionally" cruelly punished the baby. See § 28-707. Our law is that a person ordinarily intends the natural and probable consequences of his knowing acts, but that he need not intend the particular result, or in this case, the particular injury. See *State v. Swigart*, 233 Neb. 517, 446 N.W.2d 216 (1989). Thus, it would be reasonable for the jury to infer that Parks intentionally cruelly punished the baby by grabbing him by the leg and rapidly and violently pulling him up and flipping him over. A natural consequence of such twisting force is this injury. There is ample evidence that Parks cruelly punished the baby, and that is enough to sustain the conviction.

## Excessive Sentence.

A sentence within statutory limits, which Parks' sentence of 18 to 36 months' imprisonment is, will not be disturbed in the absence of an abuse of discretion. See *State v. Cook*, 251 Neb. 781, 559 N.W.2d 471 (1997). Parks is no stranger to the criminal process, and the baby suffered a serious bodily injury, although Parks was not charged with inflicting such, which would have made this a Class III felony. Accordingly, there is most certainly no abuse of discretion in the sentence.

AFFIRMED.